James F. HUTSON, Plaintiff–Appellant,

v.

McDONNELL DOUGLAS CORPORATION, Defendant–Appellee.

No. 95–1236.

United States Court of Appeals, Eighth Circuit.

Submitted June 16, 1995.

Decided Aug. 24, 1995.

772

Terry A. Bond, Clayton, MO, argued, for appellant.

Thomas C. Walsh, St. Louis, MO, argued (Timothy A. Garnett and Elizabeth A. Bousquette, on the brief), for appellee.

Before WOLLMAN, Circuit Judge, HANSEN, Circuit Judge, and MAGNUSON,* District Judge.

MAGNUSON, District Judge.

In this appeal, James Hutson challenges the district court's[1] decision granting summary judgment against him in his age-discrimination action against the McDonnell Douglas Corporation (McDonnell Douglas). We affirm.

---

* The HONORABLE PAUL A. MAGNUSON, Chief Judge, United States District Court for the District of Minnesota, sitting by designation.

1. The Honorable Carol E. Jackson, United States District Judge for the Eastern District of Missouri.

## I

Hutson began working for McDonnell Douglas during the 1960s. Over the years, Hutson was employed in a variety of positions; in 1988, he volunteered to work on the "A–12" program for McDonnell Aircraft Company and was transferred accordingly. Hutson's role in the A–12 program involved making purchases of supplies and materials used in constructing aircraft. In 1991, the Department of Defense terminated the A–12 contract, and McDonnell Douglas therefore instituted a substantial layoff of employees. Hutson was initially one of the employees targeted for layoff, but, rather than being terminated, was reassigned to work on the A–12 "termination project". Hutson's new duties involved negotiating settlements with the many suppliers whose contracts McDonnell Douglas no longer needed in light of the termination of the A–12 program.

In 1992, McDonnell Douglas consolidated its component companies, including McDonnell Aircraft Company, into two entities known as McDonnell Douglas Aerospace–East and McDonnell Douglas Aerospace–West. In conjunction with that consolidation, the company decided to further reduce the number of its employees. In addition, McDonnell Douglas asserts, and Hutson does not contest, that there was a diminished need for employees in the A–12 termination project as the various supplier contracts were resolved.

In order to effectuate its 1992 employee-reduction goal, McDonnell Douglas instituted a program called "Relative Assessment Scoring". Under this program, individual managers were asked to assign rankings to their employees with respect to a variety of specific factors, including present performance, past performance, merit pay increases, responsibility, experience, leadership, education and training, and personal commitment. Each ranking corresponded to a specific number of relative assessment "points", the sum of which constituted the employee's overall relative assessment score. The relative assessment program weighted present performance much more heavily than past performance: only 10 relative assessment "points" were available for past performance, while 26 were available for present performance.

Daryl Yochum, Hutson's supervisor, completed a relative assessment for Hutson, as he did for the ten other employees under his supervision. Based on Yochum's rankings, Hutson's total relative assessment score was 37 out of a possible 100 points. This score placed Hutson fifth from the bottom of some 155 employees at his grade level working in procurement. After the relative assessment scoring was completed, Yochum recommended to his superior, Jack House, that Hutson be designated for layoff, and House concurred. Hutson was then laid off; he was 53. The only other person under Yochum's supervision released was Deborah Parent, then 31.

Throughout this litigation, Hutson has relied upon five pieces of circumstantial evidence to support his claim of age discrimination. First, Hutson points out, correctly, that his evaluations at McDonnell Douglas were almost uniformly positive. In 1987, for example, Hutson received two ratings of "Competent", in 1988 and 1989, he was rated as "Superior", and for 1990 he received a rating of "Meets Expectations".

Second, Hutson relates that after he received notice of the company's intent to terminate him during the first round of layoffs but before he was reassigned to the A–12 termination project, he wrote a letter to the chairman of McDonnell Douglas complaining that his scheduled layoff was unfair and possibly discriminatory. Hutson asserts that his reassignment to the A–12 termination project was a direct result of this letter. Moreover, Hutson contends that when he returned to work, his then-supervisor Norm Tuffli congratulated him on the success of his opposition to the layoff, stating that: "He was glad that I had written that letter because they can't push the old people around in this place like they're doing." (Joint App. at 154.)

Third, in 1984, D.A. Jacobs, then-Director of Purchasing, circulated a memorandum asking for recommendations of "high potential" employees to be considered for management advancement. The memorandum specifically asked respondents to identify the

age category of the high-potential employees and limited the number of employees per category. While the memorandum was not addressed or copied to Hutson, he nevertheless obtained a copy.

Fourth, in 1986, the Chairman of McDonnell Douglas distributed to employees a document entitled "Five Keys in Perspective". In this document, the President of McDonnell Douglas, John McDonnell, outlined his "own personal view of MDC's new management initiatives," and urged the adoption of a new corporate culture (Joint App. at 131.) Hutson emphasizes that on page 3 of McDonnell's manifesto, he writes that "there is a less direct but, I believe, equally powerful reason [for the new corporate culture]— namely, our ability to hire and retain the best young people. The work ethic and motivations of people, especially younger people, are changing. No longer are young people willing to put up with the type of rigid, seniority-based command structure that has been the normal organizational form." (*Id.* at 132.)

And fifth, Hutson presents a statistical analysis of McDonnell Douglas' layoffs conducted by Dr. James Evans, a professor of social sciences. Dr. Evans compared the rate of layoff for employees in the St. Louis area that were under 40 years of age with those 53 years of age and older, and determined that the former group of employees had a layoff rate of 8.63%, while the latter had a layoff rate of 26.23%. Based on these results, Dr. Evans concluded that the differing rates of layoff were consistent with systematic age bias.

Hutson initiated this suit against McDonnell Douglas in May of 1993, alleging violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq.* In December of 1994, the district court entered summary judgment against Hutson. After first assuming that Hutson could make out a *prima facie* case of age discrimination under the Supreme Court's decisions in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and under this court's

decision in *Holley v. Sanyo Mfg., Inc.,* 771 F.2d 1161 (8th Cir.1985), the lower court ruled that Hutson had failed to adduce sufficient evidence of a genuine issue of material fact as to whether McDonnell Douglas' explanation for its treatment of Hutson, namely the reduction-in-force (RIF) and Hutson's poor relative assessment total, was a pretext for discrimination. The district court also rejected Hutson's claim that his case should be analyzed under the so-called "mixed motives" test of *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), concluding that Hutson had not shown that the action taken against him involved a mixture of legitimate and illegitimate motives. Hutson appeals from this decision.

## II

In reviewing a district court's decision to grant summary judgment, this court applies the same standards as the district court. *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 510 (8th Cir.1995). Summary judgment is appropriate if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Of course, the court must view the evidence provided in the light most favorable to the nonmoving party to determine whether that evidence does in fact create a genuine issue for trial. *See Reierson v. Resolution Trust Corp.,* 16 F.3d 889, 891 (8th Cir.1994). The scope of review is *de novo.* *Commercial Union Ins. Co. v. McKinnon,* 10 F.3d 1352, 1354 (8th Cir.1993).

The touchstone of a claim of disparate treatment under the ADEA, as it is under a number of the other employment-discrimination statutes, is intentional discrimination against the plaintiff. *See Serben v. Inter–City Mfg. Co., Inc.,* 36 F.3d 765, 766 (8th Cir.1994) (per curiam), *cert. denied,* —— U.S. ——, 115 S.Ct. 1402, 131 L.Ed.2d 290 (1995); *Bethea v. Levi Strauss & Co.,* 827 F.2d 355, 357 (8th Cir.1987); *Leichihman v. Pickwick Int'l,* 814 F.2d 1263, 1269 (8th Cir.), *cert. denied,* 484 U.S. 855, 108 S.Ct. 161, 98 L.Ed.2d 116 (1987). There is, however, more than one method by which an employment-

discrimination plaintiff can attempt to demonstrate intentional discrimination to the finder of fact. First and foremost, such a plaintiff may allege that there is direct evidence that the employer discriminated against the employee on the basis of a prohibited characteristic. In such a case, the plaintiff need not resort to alternative methods of proof but may instead choose to rely solely on the purported direct evidence to support the claim of intentional discrimination.

In recognition of the fact that explicit, inculpatory evidence of discriminatory intent is rare, see *Gaworski v. ITT Commercial Finance Corp.*, 17 F.3d 1104, 1108 (8th Cir.) (" '[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes' ") (quoting *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983)), *cert. denied,* —— U.S. ——, 115 S.Ct. 355, 130 L.Ed.2d 310 (1994), the Supreme Court has established an alternative method of proof by which an inference of intentional discrimination can be raised. This inferential method of proof, which involves an elaborate set of shifting burdens of production, was originally set forth in *McDonnell Douglas* and then refined in *Burdine.* (It is well settled that this analysis, although developed in the context of Title VII, applies with equal force to claims under the ADEA. *Bashara v. Black Hills Corp.*, 26 F.3d 820, 823 (8th Cir.1994); *Holley*, 771 F.2d at 1164.) Under the *McDonnell Douglas* framework, the plaintiff creates an inference of intentional discrimination by establishing the so-called *prima facie* case. *St. Mary's Honor Center v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); *see Hardin v. Hussmann Corp.*, 45 F.3d 262, 264 (8th Cir. 1995) ("[t]he importance of the prima facie showing is that it creates the inference that the employer terminated the plaintiff for an impermissible reason"). While its elements will vary depending on the circumstances of the case, the fundamental purpose of the *prima facie* case is to require the plaintiff to show (1) that an adverse employment action occurred, and (2) that the most common explanations for an adverse employment action, such as incompetence, are not applicable.

Once established, the *prima facie* case entitles the plaintiff to a rebuttable presumption that intentional discrimination played a role in the adverse employment action. *Krenik v. County of Le Sueur,* 47 F.3d 953, 958 (8th Cir.1995); *Kobrin v. Univ. of Minnesota,* 34 F.3d 698, 702 (8th Cir.1994).

The standard elements of a *prima facie* case of age discrimination in the termination context are: "(1) that [the plaintiff] is within the protected age group; (2) that he met applicable job qualifications; (3) that he was discharged; and (4) that, after his discharge, the position remained open and the employer sought applicants with similar qualifications to fill the position." *Bashara*, 26 F.3d at 823. In *Holley, supra,* this court recognized that the fourth element of the standard *prima facie* case, *i.e.,* an attempt to replace the plaintiff, was inappropriate in the context of a RIF and that therefore some modification of the standard test was necessary. On the one hand, application of the fourth element in a RIF case may bar recovery simply because, during a RIF, employers are frequently eliminating positions as well as releasing individual employees. On the other, if the fourth element were excused when a RIF was involved, " 'anyone in the protected age group will presumptively have a cause of action under the ADEA.' " *Holley,* 771 F.2d at 1165 (quoting *Coburn v. Pan American World Airways, Inc.,* 711 F.2d 339, 343 (D.C.Cir.), *cert. denied,* 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 683 (1983)); *see also Johnson v. Minnesota Historical Soc'y,* 931 F.2d 1239, 1243 (8th Cir. 1991). For this reason, this court in *Holley* established that an age-discrimination plaintiff in the RIF context need not establish the fourth element of the standard *prima facie* test, attempted replacement, but instead must provide some "additional showing" that age was a factor in the termination. 771 F.2d at 1165; *see also, Hardin,* 45 F.3d at 264; *Kehoe v. Anheuser–Busch, Inc.,* 995 F.2d 117, 119 (8th Cir.1993).

When and if the plaintiff establishes a *prima facie* case of discrimination, the burden of production then shifts to the defendant to articulate a legitimate, non-dis-

criminatory reason for the adverse employment action. *Hicks,* —— U.S. at ——, 113 S.Ct. at 2747; *McLaughlin,* 50 F.3d at 510. If the defendant fails to do so, the plaintiff is entitled to a finding of intentional discrimination. *Hicks,* —— U.S. at —— n. 3, 113 S.Ct. at 2748 n. 3; *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094 ("if the employer is silent ... the court must enter judgment for the plaintiff"). If the defendant does provide such a reason, however, the burden shifts back to the plaintiff to demonstrate that the reason provided was a pretext for discrimination. *McLaughlin,* 50 F.3d at 510. And, as the Supreme Court recently held in *Hicks,* proof that the defendant's articulated explanation is false or incorrect does not, standing alone, entitle the plaintiff to judgment; instead, the showing must be that the explanation is a pretext *for* discrimination. *See Hicks,* —— U.S. at ——, 113 S.Ct. at 2752; *see also, Krenik,* 47 F.3d at 958 (to survive summary judgment, plaintiff must provide evidence that defendant's proffered explanation is both incorrect and that discrimination is the true explanation). This does not necessarily require the plaintiff to submit specific additional evidence, for, in some cases, the evidence establishing the *prima facie* case, in conjunction with disproof of the explanation proffered by the defendant, may be sufficient to persuade the fact finder as to the ultimate issue of intentional discrimination, *id.* at ——, 113 S.Ct. at 2749, but it does recognize that the burden of·persuasion as to this question remains with the plaintiff at all times and that this burden cannot be carried *merely* by showing the defendant's explanation to be incorrect, contrived, or deceitful. *See Kobrin,* 34 F.3d at 703 (rejection of defendant's proffered explanations may permit, though does not require, a finding of intentional discrimination); *Nelson v. Boatmen's Bancshares,* 26 F.3d 796, 801 (8th Cir.1994) ("obviously contrived" explanation by employer allows, but does not necessarily require, the fact finder to infer intentional discrimination).

## III

■ In this case, the district court applied the *McDonnell Douglas* framework and granted summary judgment in favor of McDonnell Douglas. Assuming for the sake of decision that Hutson had established the elements of a *prima facie* case of age discrimination, the district court determined that McDonnell Douglas met its burden of production by articulating a legitimate, nondiscriminatory explanation for Hutson's termination, *i.e.,* the RIF and Hutson's low relative assessment score. For purposes of summary judgment, this meant that the burden shifted back to Hutson to demonstrate the existence of a genuine issue of material fact as to whether McDonnell Douglas' explanation is a pretext for discrimination. After reviewing each of the pieces of evidence relied upon by Hutson in this regard, the district court concluded that Hutson's evidence was insufficient. We agree.

Addressing Hutson's evidence in reverse order, we first take up his statistical analysis of the RIF. Hutson claims that this analysis, which compares the discharge rates of individuals under 40 with those 53 and over throughout the procurement departments in the St. Louis area, demonstrates that the RIF was executed in an age-discriminatory manner and therefore supports a conclusion that McDonnell Douglas' explanation of Hutson's discharge is pretextual.

■ Hutson's statistical evidence is not probative of pretext in that it fails to analyze the treatment of comparable employees. *See Harvey v. Anheuser–Busch, Inc.,* 38 F.3d 968, 972 (8th Cir.1994) (where pretext argument is based on comparisons of employees, plaintiffs must show that employees are ' " 'similarly situated in all relevant aspects' " ') (quoting *Jones v. Frank,* 973 F.2d 673, 676 (8th Cir.1992) (quoting *Lanear v. Safeway Grocery,* 843 F.2d 298, 301 (8th Cir.1988))). Because Hutson does not claim that the RIF itself was motivated by discrimination, Hutson's statistics would have to show, in order to address the necessary question, that employees with similar relative assessment scores were treated differently. In statistical terms, Dr. Evans' analysis fails to control for the most obvious relevant variable and, indeed, the one relied upon by McDonnell Douglas for its discharge of Hutson: the low relative assessment score.

Even if the court were to assume that Hutson's statistics demonstrate the existence of system-wide bias against older individuals at McDonnell Douglas in the execution of the RIF, therefore, that is not enough to discredit the specific explanation offered in *Hutson's* case.

*MacDissi v. Valmont Industries, Inc.*, 856 F.2d 1054 (8th Cir.1988), cited by Hutson in support of his statistical evidence and its probative value, is not to the contrary. In *MacDissi*, this court stated that relevant quantitative evidence may support a finding of pretext, particularly where there are "independent, direct grounds" for disbelieving the employer's explanation for discharge. *Id.* at 1058. There, the statistic in question was the fact that the two oldest employees in a nine-employee department were terminated.

Most importantly for this case, *MacDissi* does not eliminate the requirement that statistics, to be meaningful indicators of pretext, evaluate the treatment of comparable employees. Quite to the contrary, that decision specifically minimizes the evidentiary significance of "company-wide" statistics, like those presented here, to the narrow question of pretext, because such statistics "have relatively little relevance to determining ... discriminatory animus" of the specific manager who made the ultimate decision to terminate. *Id.* at 1059. Relating the actual analysis conducted by the *MacDissi* court to this case reveals a second distinction: in that case, the two oldest employees in a small department were terminated; here, one of the oldest employees and one of the youngest employees in a similarly small department were terminated. Contrary to Hutson's assertions, the outcome in this case is thus *not* the sort of result "which could cause a reasonable trier of fact to raise an eyebrow." *Id.* at 1058. Finally, we specifically distinguished our ruling in *MacDissi*, where there were "independent, direct grounds" other than the statistics for disbelieving the employer's explanation, from cases like *Holley*, "in which a plaintiff seeks to discredit an employer's proffered non-discriminatory reasons for termination solely by demonstrating an overwhelming statistical probability of discrimi-

nation." *Id.* As described in more detail below, no independent, direct grounds have been provided for disbelieving McDonnell Douglas' explanation.

The next three components of Hutson's assertion of pretext are the two memoranda from the mid–1980s and the statement by Tuffli in 1991. In Hutson's view, these three pieces of evidence demonstrate the existence of a "youth movement" at McDonnell Douglas. Hutson argues that the district court erred in evaluating this evidence by imposing a requirement that Hutson show some causal relationship between the evidence and his termination. In particular, Hutson claims that under this court's recent decision in *Hardin v. Hussmann Corp.*, 45 F.3d 262 (8th Cir.1995), there is no requirement that any causal connection be shown between evidence of a discriminatory "attitude" at a workplace and an adverse employment action.

Hutson's reliance on *Hardin* is misplaced. In that case, we considered whether certain statements by individuals not involved in the adverse employment decision and which substantially predated that decision could suffice to make the "additional showing" required by *Holley*. While not specifically addressing the degree to which a causal relationship between the alleged evidence of discriminatory animus and the adverse employment action need be shown to satisfy *Holley*, we held that the statements in question, in combination with other evidence, fulfilled the "additional showing" requirement. Under *Hardin*, therefore, non-contemporaneous statements of other employees, even if not the employees who ultimately made the decision as to the adverse employment action, are not irrelevant to the "additional showing" inquiry merely because the plaintiff has failed to demonstrate a direct causal relationship between the statements and the adverse employment action.

■ The difficulty for Hutson in this case, however, is that the "additional showing" inquiry is not identical to the inquiry into pretext. The "additional showing" inquiry is merely part of the establishment of the *prima facie* case, the purpose of which is to shift the burden of production to the defendant to provide an explanation for its

apparently discriminatory behavior. The only question is whether the circumstances are such that, in the absence of an explanation from the defendant, a fact finder may reasonably infer intentional discrimination. As we have pointed out in the past, this is not a significant hurdle for an employment-discrimination plaintiff. *Krenik,* 47 F.3d at 957 (establishing *prima facie* case not a "difficult or onerous burden"). At the pretext stage, by way of contrast, the question is much more focussed: Has the plaintiff shown that the explanation extracted from the defendant by virtue of the *prima facie* case is a pretext for discrimination? There is no reason to believe, *a priori,* that the contours of such an inquiry, which is intimately related to the ultimate issue to be determined, *i.e.,* intentional discrimination, is identical to the initial, but important, task of forcing the employer to explain its actions.

In fact, we have already addressed this issue in a very similar procedural context, albeit pre-*Hicks,* and ruled that *some* causal relationship is necessary to demonstrate the significance of non-contemporaneous statements, or statements made by persons other than the relevant decision-maker, to the resolution of the ultimate issue of intentional discrimination. In *Frieze v. Boatmen's Bank of Belton,* 950 F.2d 538 (8th Cir.1991), this court considered whether three prior, age-related statements by various employees were sufficient to support a jury finding of intentional discrimination. We held, first, that statements by two of the employees could not support an inference of discrimination because those employees "did not take part in the decision to discharge." *Id.* at 541. Second, with respect to a statement by the person who in fact made the decision to terminate, we held that a four-year gap between the statement and the termination rendered the statement effectively stale when it came to allowing an inference of intentional discrimination. Because these statements had an insufficient causal relationship to the actual decision to terminate, we ruled that they could not support a jury finding of intentional discrimination.

Because the issue in this case, like that in *Frieze,* involves the ultimate issue to be decided in an employment-discrimination case rather than the initial issue of whether the employer will be required to explain its decision, the district court was entirely correct in evaluating the two prior memoranda and the statement by Tuffli in light of their causal relationship to the decision to discharge Hutson. The lower court was also correct in concluding that Hutson had made no showing of such a relationship. The two documents, the "Five Keys" and the "high-potential employees" memoranda, were written by individuals not involved in the decision to terminate Hutson, and there is no evidence connecting those memoranda to Yochum's evaluation or decision. Moreover, both were written nearly a decade prior to Hutson's discharge. The lack of a causal relationship is even more striking with respect to Tuffli's comment about the mistreatment of older employees. Not only was Tuffli not involved in the decision to terminate Hutson, the statement itself is less an exhibition of discriminatory animus than Tuffli's mere opinion that such animus might exist. In fact, Hutson's evidence in this regard is even weaker than was the evidence in *Frieze,* where at least one of the comments in question was made by the person who ultimately made the decision to terminate.

Hutson's final piece of circumstantial evidence is his undisputed record of generally positive performance reviews. This evidence is particularly unpersuasive. As we have previously observed, even capable employees are released when an employer is down-sizing, and therefore evidence of competence is not particularly probative. *See, e.g., Holley,* 771 F.2d at 1166 (termination of competent employee during RIF does not raise inference of discrimination). This observation has particular force where, as in this case, the employer is engaging in a second round of layoffs, because any employee released during the second round has already survived the first rounds of cuts and is therefore presumptively competent. Hutson correctly notes that this court held in *Frieze* that demonstration of competence may serve as evidence of pretext when an employee is discharged for incompetence. McDonnell Douglas' explanation for Hutson's discharge was not incompetence, however,

but a RIF whose legitimacy has not been challenged and an assessment that Hutson was *less* competent than the other employees in his department.

Hutson contends that evidence of his competence nonetheless supports a finding of pretext because it casts doubt on the low relative assessment score he received. Such a proposition might be generally tenable, were it true, but Hutson fails to identify any actual conflicts between the relative assessments given by Yochum and the prior evaluations. Moreover, there do not appear to be any. On the relative assessment, Hutson scored especially poorly on past performance, leadership, and responsibility. With respect to past performance, this scoring can hardly be inconsistent with Hutson's prior reviews because it was explicitly based on one of Hutson's most recent performance reviews, which, while generally positive, was not glowing. Hutson contends that his earlier performance ratings should have been weighted more heavily, but this is nothing more than an attack on the business judgment of McDonnell Douglas in how it chose to evaluate its employees. There is nothing inherently discriminatory in an employer choosing to rely on recent performance more heavily than past performance in deciding which employees to terminate during a RIF. Hutson also challenges his low scores in responsibility and leadership as being essentially subjective, but we have previously noted that the presence of subjectivity in employee evaluations is itself not a grounds for challenging those evaluations as discriminatory. *See Bashara,* 26 F.3d at 825 (absence of objective criteria not probative of discriminatory animus in RIF); *Elliott v. Montgomery Ward & Co.,* 967 F.2d 1258, 1263 (8th Cir.1992) ("[t]hat an evaluation process contains some subjective components cannot in and of itself prove pretext or discriminatory intent").

In sum, the district court correctly concluded that Hutson failed to demonstrate a genuine issue of material fact as to whether McDonnell Douglas' explanation for his termination, *i.e.*, the RIF and Hutson's low relative assessment score, was a pretext for age discrimination.

## IV

Hutson alternatively contends that the district court erred in rejecting his request to have this case evaluated under the mixed-motives analysis of *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). (*Price Waterhouse,* like *McDonnell Douglas,* was decided in the Title VII context, but has been subsequently applied to claims under the ADEA. *Krenik,* 47 F.3d at 957; *Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444, 448 (8th Cir.1993); *Beshears v. Asbill,* 930 F.2d 1348, 1353 (8th Cir. 1991).) Under *Price Waterhouse,* once an employment-discrimination plaintiff has persuaded the fact finder that, more likely than not, discrimination was "a motivating part in an employment decision," the defendant-employer can escape liability only by proving that the employment decision would have been taken in any event for legitimate, nondiscriminatory reasons. *Price Waterhouse,* 490 U.S. at 258, 109 S.Ct. at 1794–95; *Beshears,* 930 F.2d at 1353.

The district court correctly rejected Hutson's request to apply *Price Waterhouse.* The essential prerequisite of *Price Waterhouse* analysis is a showing that there was a discriminatory component of an adverse employment decision. Such a showing cannot be made through the introduction of mere " 'stray remarks in the workplace,' 'statements by nondecision-makers,' or 'statements by decision-makers unrelated to the decisional process itself.' " *Beshears,* 930 F.2d at 1354 (quoting *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. at 1804–05). In addition, when the plaintiff relies on a discriminatory "attitude" in the workplace to justify *Price Waterhouse* analysis, there must be a showing of a causal relationship between that attitude and the adverse employment action. *Sargent v. Paul,* 16 F.3d 946, 948 (8th Cir. 1994).

Under these standards, Hutson's evidence fails to raise a jury issue as to whether age-related animus played a role in his discharge. The two memoranda from the 1980s do not demonstrate the necessary discriminatory intent, as they involve statements by persons outside the decisional process; the same is true of the statement by Tuffli in 1991. (The

latter would also probably qualify as a statement by a nondecision-maker, and certainly as a stray remark.) Even assuming that these documents and statements, coupled with the statistical analysis generated by Dr. Evans, suggest the existence of a company-wide discriminatory animus, Hutson has failed to articulate or show any causal link between that general, background animus and his discharge.

## V

On the record presented to this court, this case appears to be precisely the type of employment dispute that this court has repeatedly stated is not covered by the discrimination laws. Without adjudging Hutson's subjective good-faith belief in his cause of action, it is clear to the court that this lawsuit is less about possible age discrimination than it is about whether McDonnell Douglas' decision to discharge Hutson, as opposed to some of the other employees under Yochum's supervision, was fundamentally unfair or arbitrary. It has become a commonplace for this court to observe, and it observes again here, that the employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination. *See, e.g., Krenik,* 47 F.3d at 960; *Harvey,* 38 F.3d at 973; *Beith v. Nitrogen Products, Inc.,* 7 F.3d 701, 703 (8th Cir.1993); *Holley,* 771 F.2d at 1166 n. 8.

The judgment of the district court is affirmed.