_____

No. 95-4024EA
_____

Richard Day; Calvin Hollowell,      *
                                     *
        Plaintiffs-Appellees,        *
                                     *
    v.                               *
                                     *
Randy Johnson, Pulaski County        *    Appeal from the United States
Sheriff Elect;                       *   District Court for the Eastern
                                     *     District of Arkansas.
        Defendant-Appellant,         *
                                     *
Pulaski County Sheriff's             *
Department,                          *
                                     *
        Defendant.                   *
                             _____

              Submitted:  September 9, 1996

                Filed:  July 10, 1997
                             _____

Before FAGG, HEANEY, and BEAM, Circuit Judges.
                             _____

FAGG, Circuit Judge.

     In his 1994 campaign for Pulaski County sheriff, Randy Johnson
capitalized on the sorry state of affairs in the newly opened Pulaski
County Jail, promising, if elected, to make changes in the jail's
administration.  After Johnson won, he notified Captains Richard Day, the
jail's administrator, and Calvin Hollowell, head of the jail's troubled
intake area, they would not be reappointed to their positions.  Day and
Hollowell are black, and Johnson is white.  Before Johnson took office, and
while Day and Hollowell were still employed by Johnson's predecessor
Sheriff Gravett, Day and Hollowell filed suit against Johnson and the
Pulaski County

Sheriff's Department (the Department) under 42 U.S.C. §§ 2000e to 2000e-17 (1994) (Title VII) and 42 U.S.C. § 1983 (1994), claiming Johnson decided not to reappoint them because of their race and in retaliation for speech protected by the First and Fourteenth Amendments.  Johnson was ordered to retain Day and Hollowell pending trial.  The district court ruled for Day and Hollowell on their Title VII claims and for Hollowell on his § 1983 free speech claim.  As a remedy, the district court ordered Johnson to place Day and Hollowell in unspecified captain-level positions.  Johnson appeals, and we reverse.

When he was appointed jail administrator in January 1993, Day became chair of the committee charged with managing the upcoming transition from the old to the new jail.  The committee discussed at length the likelihood that the new jail's housing units would quickly become overcrowded.  When overcrowding became a reality shortly after the new jail opened in August 1994, however, Day acted like a man caught unawares.  Although others disagreed, Day put the overflow from the housing units in the jail's intake area, the hub of the new jail's entire operation.  Every person arrested in Pulaski County must be processed through intake, and every jail inmate transported to the local courts must go out through intake.  Day's decision to turn intake into a full-blown housing unit turned out badly for those housed there.  The miserable living conditions caught the attention of the Arkansas Democrat-Gazette, which reported them in widely read stories that neither Day nor Hollowell disputed at trial.  Hollowell believed the conditions were unconstitutional.  Up to 120 inmates at a time lived in the intake area, sharing twelve toilets and three showers, sleeping and sometimes even eating on the floor.  Conditions were filthy.  Unlike inmates held in the jail's housing units, inmates in intake could not receive family visits and were denied access to the outdoor exercise area. Intake staff had to meet inmates' daily

living needs, distracting staff from inmate processing and making the logjam still worse. A number of staff quit under the pressure, leaving vacancies that went unfilled. Moreover, inmates waiting in intake for transportation to court often got lost in the crowd, turning up in court hours late and sometimes not at all. One municipal court judge was forced to make his own separate inmate transportation arrangements after having thirteen no-shows in a single day.

Day's use of intake for housing was not merely unsanitary and disruptive, it was dangerous. Unlike properly housed inmates, who are segregated by sex, criminal history, and type of offense, inmates in intake were not sorted out. Intake thus held an explosive mix of men and women, violent felons and petty misdemeanants, career criminals and juveniles. Day believed the conditions were "ripe for a major riot." Day complicated matters by keeping the jail persistently understaffed. Instead of hiring needed personnel, Day turned back to the county $400,000 in authorized but unused salaries. Although Day believed the jail demanded "crisis management" on his part, Day was unfamiliar with the county's hiring policies, and merely acquiesced in Sheriff Gravett's mistaken belief that vacancies could not be filled until the departing deputies' accrued vacation time had elapsed. In fact, vacant positions could be filled immediately.

Day doggedly stuck with his failed intake policy, despite front-page newspaper coverage of intake's deplorable condition and instructions from Sheriff Gravett to move the overflow into the housing units. In mid-October Hollowell entered the picture when he replaced Captain Talley as head of intake and prisoner transportation. Hollowell had been familiar with intake's problems since at least early September, when he reported those problems to the district court on Sheriff Gravett's orders. Hollowell also

informed the media about jail conditions in his role as the Department's public information officer. Advance notice of intake's troubles did not help Hollowell either. The district court found intake conditions and inmate transportation failed to improve under Hollowell's supervision. Hollowell made matters worse when he decided to cure overcrowding by releasing, without the required authorization from a judge or prosecutor, seven accused felons who were in custody without bail. Hollowell's shortcut made front-page news, and he was reprimanded by the county prosecutor and two local judges. Although Hollowell apologized and Sheriff Gravett condoned Hollowell's action, Johnson agreed with the prosecutor, the judges, and the public that the release was a clear sign of "exceedingly bad judgment" on Hollowell's part.

In Arkansas, when a sheriff's term in office expires, so do the appointments of the sheriff's deputies. This puts the newly elected sheriff in a position to assemble a competent workforce that meets the new sheriff's expectations. After he was elected, Johnson interviewed all deputies holding the rank of lieutenant or higher under outgoing Sheriff Gravett to help Johnson decide whom to reappoint. Johnson interviewed Day and Hollowell, among the rest, questioning Day about intake and staffing, and Hollowell about intake and the felon release. Johnson also conferred with his new chief deputy Danny Bradley and his operations major Skipper Polk, Johnson's long-time colleagues in the North Little Rock Police Department (NLRPD). Bradley opposed rehiring Day and Hollowell based on media accounts of the jail's turmoil and because local police told Bradley they had lost confidence in the two men. Polk, who had recently worked for the county prosecutor, also advised against keeping Day and Hollowell based on Hollowell's felon release and on Day's low regard by the prosecutor's office and local law enforcement. Johnson also spoke with Lowell Kincaid, who served as planning coordinator for the new jail. Kincaid had

observed Day's leadership when Kincaid worked with the transition committee Day chaired. Based on what he saw, Kincaid told Johnson that Day was not an effective administrator.

On December 12, 1994, Johnson informed Day and Hollowell they would not be reappointed to their posts. After taking office on the first of January, Johnson followed through on his campaign promise to put a professional administrator in charge of the new jail by appointing Kincaid to the newly created position of chief of detention operations. Neither Day nor the district court questioned Kincaid's qualifications for this position. Jail conditions improved under Kincaid's leadership: intake was restored to its intended purposes, disciplinary proceedings against disruptive inmates declined, and the jail's failures in transporting inmates to court were eliminated.

Johnson made very few personnel moves when he took office. Out of a staff of roughly 350 under departing Sheriff Gravett, Johnson rejected only four: Day, Hollowell, and two whites, Gravett's chief deputy and a lieutenant who opposed Johnson for sheriff. Four other employees left voluntarily, all of them white. Day and Hollowell were the only blacks whom Johnson did not reappoint. Johnson transferred Captain Talley, who is black and who had moved to the enforcement division when Hollowell took over intake, back to detention. Johnson also promoted two deputies to lieutenant, both black. Although Johnson inherited a Department with a detention division that historically has employed a higher proportion of blacks than enforcement, neither Day nor Hollowell contended, nor did the district court find, that the Department's racial composition reflected race discrimination. Johnson's employment decisions have left that composition virtually undisturbed.

Johnson testified he rejected Day because Day mismanaged the intake area and left staff positions unfilled.  As the district court put it, Johnson's "bottom line" was that he "did not have confidence that Day would manage in the way Johnson wanted."  Johnson testified he rejected Hollowell because Hollowell's felon release showed poor judgment, and also because of intake conditions and inmate transportation failures.  Summarizing his reasons, Johnson said he decided not to reappoint Day and Hollowell based on "job performance and the perception of that job performance" by the public.  In keeping with Johnson's stated reasons, the district court found the new jail was "chaotic" and understaffed, with a "deplorable" intake area that posed "a security risk."  The district court also found that inmates were "delivered to court late," and acknowledged that Johnson genuinely believed Hollowell's felon release was not "an exercise in good judgment."  Notwithstanding these vivid findings, the district court found race was the real reason Day and Hollowell lost their jobs.

We review the district court's finding of intentional discrimination for clear error.  See Fed. R. Civ. P. 52(a); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 524 (1993).  A finding is clearly erroneous if it lacks substantial evidence to support it, see Johnson v. Arkansas State Police, 10 F.3d 547, 552 (8th Cir. 1993), or if, even when there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made, see United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).  Substantial evidence means "such evidence as a reasonable mind would accept as sufficient to support a conclusion."  Roberts v. Browning, 610 F.2d 528, 532 (8th Cir. 1979) (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951)).  Day and Hollowell are entitled to reasonable inferences from the evidence, but inferences must be more than speculation or conjecture to be

reasonable. See <u>Hopper v. Hallmark Cards, Inc.</u>, 87 F.3d 983, 988 (8th Cir. 1996). Because Day and Hollowell produced no direct evidence of discriminatory intent, we must decide whether they introduced sufficient circumstantial evidence to permit the district court reasonably to infer that Johnson's expressed reasons were unworthy of belief, <u>see</u> <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 256 (1981), and that intentional discrimination was the real reason Johnson rejected Day and Hollowell, <u>see</u> <u>Hicks</u>, 509 U.S. at 515. In other words, even when an employee presents some circumstantial evidence of pretext, a finding of intentional discrimination is clearly erroneous if the finding lacks plausibility when the evidence is considered as a whole. See <u>Anderson v. City of Bessemer City</u>, 470 U.S. 564, 573-74 (1985); <u>see also</u> <u>Ryther v. KARE 11</u>, 108 F.3d 832, 848 (8th Cir. 1997) (en banc) (Part I.A. of concurring and dissenting opinion, in which eight active judges joined), <u>petition for cert. filed</u>, 65 U.S.L.W. 3694 (U.S. Apr. 4, 1997) (No. 96-1571). Reviewing the evidence relied on by the district court, we conclude Day and Hollowell failed to present sufficient circumstantial evidence for the district court reasonably to infer that Johnson's stated reasons were a coverup for racial discrimination.

To begin with, the district court was clearly mistaken in its view that Johnson was too poorly informed to make an honest assessment of Day's and Hollowell's job performances. The district court made light of Johnson's reliance on news accounts despite its recognition that the jail's problems were thoroughly aired in media reports that Day and Hollowell never challenged. Johnson was also informed by "general talk in the community," which included the opinions of local police officers and prosecutors, sources public employers like Johnson may rely on. See <u>Waters v. Churchill</u>, 511 U.S. 661, 676 (1994). Johnson also made his own first-hand observations at the jail, which he visited several times and for

several hours at a time.  Bolstered by the district court's finding that intake was in a "chaotic" and "deplorable" state, what Johnson saw during his visits would be enough reasonably to convince an observer in Johnson's position that the jail's management had failed.  Additionally, the topics Johnson raised in Day's and Hollowell's interviews--intake, staffing, and the felon release--show Johnson was well aware of the jail's problems in their areas of responsibility.

The district court believed Johnson's failure to discuss Day's and Hollowell's qualifications with Sheriff Gravett undermined the plausibility of Johnson's nondiscriminatory explanation.  We disagree.  Johnson was entitled to put little stock in what Gravett might say about Day's and Hollowell's current job performances because Johnson could evaluate their performances himself.  Further, Gravett's assessment of Day's and Hollowell's work histories sheds no light on whether Johnson honestly based his employment decisions on their job performances at the new jail.  See Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1460 (7th Cir. 1994).  The district court also felt Johnson's reasons for rejecting Day were "too broad to withstand scrutiny" because Johnson blamed Day for things beyond Day's control, like overcrowding and staff turnover.  The district court is mistaken.  Johnson blamed Day only for problems Day knew were coming and failed to resolve.  As the district court found, "everyone involved with the planning of the new jail anticipated that it would be overcrowded," and "[s]taff turnover was also expected."  Likewise, Hollowell knew about these problems before he took over intake and transportation, and he was unable to deal with the problems despite his forewarning.  Johnson was also justified in relying on Hollowell's release of unbailable felons into the community as a reason for rejecting him.  The district court found Johnson's reliance was pretextual because Sheriff Gravett condoned the

release and Hollowell apologized and promised never to do it again. The focus of the pretext inquiry is Johnson's motivation, however, and neither Gravett's approval nor Hollowell's promises cast any doubt on the sincerity of Johnson's belief that Hollowell had shown bad judgment.

According to the district court, the "most telling" evidence of pretext was Johnson's appointment of three whites to the top posts in his administration. Although the district court recognized Johnson had the right to hire anyone he wanted for these policymaking positions, which are exempt from Title VII under 42 U.S.C. § 2000e(f), the district court found pretext because Day and Hollowell have better resumes than the appointed whites, Chief Deputy Bradley, Major Polk, and Major Scarborough. Day and Hollowell are captains and have earned four-year college degrees, but Johnson's top three officers have not graduated from college, and only one, Bradley, had made captain in the NLRPD. Contrary to the district court's view, comparing resumes is meaningless because Day and Hollowell were not candidates for any of the positions Bradley, Polk, and Scarborough received. Disparate treatment of black and white employees who are not similarly situated is not evidence of pretext. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804 (1973); Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972 (8th Cir. 1994). Besides, there is powerful evidence that Day and Hollowell mismanaged the jail despite their fine resumes.

Although Johnson made approximately 350 employment decisions when he took office, the district court believed Johnson's treatment of one black officer, Captain Talley, was "probative of Johnson's discriminatory attitude." Johnson moved Talley back to detention without asking him if he wanted to move, but Johnson asked a white captain who had no experience in the new jail, Jimmy White, if he wanted to remain in his current position and left him

there.  Setting aside that Talley and White were not similarly situated, the district court's concern about Talley is misplaced because any disparate treatment of Talley is irrelevant to Day's and Hollowell's claims.  See Swapshire v. Baer, 865 F.2d 948, 953 (8th Cir. 1989). Although Talley preferred to stay in enforcement, we see nothing amiss in Johnson's decision to move Talley back to an administrative position in detention to shore up the jail's troubled operation.  Talley experienced the jail's failures when carrying out Day's directions, which he disagreed with, before Day appointed Hollowell to head intake.  Having promised the voters he would solve the jail's problems, Johnson needed the steadying hand of competent leadership at the jail, and Johnson's choice of Talley for a top jail position strikes us as a vote of confidence.

The district court found more evidence of Johnson's discriminatory attitude in a career-path policy Johnson established after he took office. Because Johnson considers the Department's enforcement and detention divisions as separate career paths requiring different skills and training, Johnson wants to minimize cross-divisional transfers to take advantage of the expertise that comes with extended experience within a division. Without addressing this race-neutral reason, the district court took the view that Johnson's policy will "lock African-Americans in what is considered by some as . . . less desirable position[s] in detention," which "traditionally has had a larger percentage of African-American employees" than enforcement.  The record does not support the district court's view, however.  In the first place, Johnson's career-path policy is irrelevant to Day's and Hollowell's claims because it was not adopted until after Johnson decided against their reappointment.  Besides, Johnson inherited the racial imbalance from his predecessors, and Day and Hollowell never alleged, nor did the district court find, any racial discrimination in the hiring practices of the earlier sheriffs.  Also, the

-10-

district court is mistaken that blacks are "lock[ed]" into detention "without the opportunity to work in enforcement."  In uncontradicted testimony, Johnson made clear that under his policy, deputies in detention remain free to apply for available positions in enforcement (and vice versa), they receive preference over outsiders, and they switch divisions without loss of salary or seniority.  They may have to start anew to earn rank only because their expertise in the division they left does not necessarily qualify them to exercise command in their new division.  Although the district court's findings do not reveal who feels jobs in detention are "less desirable" or why, those views shed no light at all on Johnson's attitude.  Actually, the district court's findings about the sorry state of affairs in the jail drive home the importance of a program that encourages stable careers in detention.

Finally, the district court found evidence of pretext in Johnson's conferences with "white friends," appointees Kincaid, Bradley, and Polk, before rejecting Day and Hollowell.  The district court erroneously believed Johnson's appointees lacked "personal knowledge" about Day and Hollowell and thus found their advice "suspect."  But Kincaid worked with Day on the new jail's transition committee.  Bradley and Polk knew all they needed to know from news reports of the jail's turmoil and from conversations with local police officers:  Day and Hollowell were running a failed operation.  Moreover, the reasons Johnson gave for rejecting Day and Hollowell were not concocted with the after-the-fact help of so-called "white friends" because Johnson promised to make changes at the jail during his campaign for election, and neither Day and Hollowell nor the district court suggest Johnson's campaign was racially motivated.  Additionally, there is no evidence that Johnson or his appointees ever made disparaging remarks about

anyone's race, and the mere fact Johnson's closest advisors are white does not render their advice "suspect."

Even though Day and Hollowell failed to discredit the legitimate, nondiscriminatory reasons motivating Johnson's rejection of Day and Hollowell, the district court felt it was "incredible" Johnson would reject veteran, well-educated employees with years of satisfactory service in the Department. Thus, declaring Day and Hollowell "competent captain[s]," the district court ordered Johnson to place them in unspecified positions "at the captain level." Because there is a difference between performing a job and holding a rank, a court applying Title VII must ask whether the job applicant was qualified for a particular available position, not whether the applicant is an otherwise deserving rankholder. See Burdine, 450 U.S. at 253. No doubt Day and Hollowell advanced in rank over the years because they ably handled the positions their increasing rank progressively entitled them to fill. They failed, however, to measure up to their most recent assignments, and rank earned through satisfactory performance in other positions does not insulate them from the consequences of failure in their positions at the new jail. The district court's strongly held feeling that Johnson should have paid attention to Day's and Hollowell's positive past accomplishments "is nothing more than an attack on [Johnson's] judgment [about] how [he] chose to evaluate [Gravett's] employees." Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 780 (8th Cir. 1995). As we said of the reduction-in-force selection in Hutson, "[t]here is nothing inherently discriminatory" in Johnson's reliance on Day's and Hollowell's recent failures in deciding whether he would include them in his administration. Id.

Although the district court faults Johnson for not considering Day and Hollowell for other positions, Day and Hollowell never

showed interest in any other specific positions, suggested bumping other captains in their favor, or indicated their willingness to accept demotions so they might fill lesser positions. Johnson did not discriminate against Day and Hollowell when he did not consider them for positions they did not seek. See Tart v. Levi Strauss & Co., 864 F.2d 615, 618 (8th Cir. 1988). Although we understand the district court's disappointment that Day and Hollowell lost their jobs, federal courts are not self-appointed personnel managers, and they may not second-guess the fairness or wisdom of an employer's nondiscriminatory employment decisions. See Aucutt v. Six Flags Over Mid-America, Inc., 85 F.3d 1311, 1317 (8th Cir. 1996); Harvey, 38 F.3d at 973.

The district court's Title VII findings are also flawed because the district court failed to draw another inference we find inescapable from the record. See Arkansas State Police, 10 F.3d at 552. In its wide-ranging search for hints of pretext, the district court overlooked substantial evidence that, job performances aside, Johnson rejected Day and Hollowell for political reasons. Assuming Day and Hollowell did the best anyone could do under the circumstances at the new jail, the situation looked bad, and they paid the political price for being in the wrong place at the wrong time. Johnson acknowledged he was concerned about the public's perception of their job performance. Viewing the facts as sympathetically to Day and Hollowell as we can, Day and Hollowell emerge as political scapegoats, forced out by Johnson to make good on his campaign pledge. In sum, we are convinced Day and Hollowell lost their jobs because they either were or seemed to be responsible for the tangled situation at the new jail, but not because of their race.

We turn now to the district court's judgment for Hollowell on his § 1983 free speech claim. In 1979, the District Court for the

Eastern District of Arkansas assumed jurisdiction over the old Pulaski County jail under the terms of a consent decree. About a month after the new jail opened, the district court contacted Hollowell and asked about jail conditions. The district court found Hollowell communicated with the district court as part of his duties as the Department's public information officer and at the direction of Sheriff Gravett. During Hollowell's employment interview, Johnson told Hollowell he disfavors federal court oversight of the new jail. The district court believed Johnson's view was a reasonable one, and recognized as well that neither "[S]heriff [Gravett] [n]or anybody else" wanted federal supervision. Johnson also told Hollowell he disagreed with Hollowell's having gone to the district court. When Johnson gave Hollowell notice he would not be retained, Hollowell felt Johnson was retaliating against him for speaking to the court. The district court agreed.

A public employee's speech enjoys limited protection under the First Amendment. See Connick v. Myers, 461 U.S. 138, 154 (1983). Whether Hollowell's speech was protected is a question of law we review de novo. See Mumford v. Godfried, 52 F.3d 756, 760 (8th Cir. 1995). Because Hollowell spoke to the district court on orders from his superior and as the Department's public information officer, not as a concerned citizen, we conclude Hollowell's speech was not protected. See Bausworth v. Hazelwood Sch. Dist., 986 F.2d 1197, 1198-99 (8th Cir. 1993). Although Hollowell's conversation with the district court about jail conditions was not put into evidence, we glean from the record that Hollowell's report left no doubt about the dismal situation at the new jail, which Hollowell did nothing to make better and made even worse through his felon release. Consequently, even if Hollowell's speech were protected, his failings as head of intake and transportation convince us Johnson would have rejected his job candidacy anyway. See Mt.

Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

We thus reverse the district court's judgment for Day and Hollowell on their Title VII claims, and for Hollowell on his § 1983 First Amendment claim, and we dissolve the injunction compelling Johnson to retain Day and Hollowell in some unspecified positions at the captain level. Because Day and Hollowell are no longer prevailing parties, we also reverse the district court's award to them of costs and attorney's fees. See Pottgen v. Missouri State High Sch. Activities Ass'n, 103 F.3d 720, 723-24 (8th Cir. 1997).

HEANEY, Circuit Judge, concurring and dissenting.

I respectfully dissent from the majority's reversal of the district court's judgment for Day and Hollowell on their claims under Title VII.[1] I have no quarrel with the legal standard as outlined by the majority and applied by the district court in rendering its decision. I also believe that the result reached by the majority is one that a trier of fact could have reached given the evidence presented at trial. Were the majority the factfinder, I would not hesitate to join in its opinion. But the district court is the trier of fact and it had the responsibility to examine the evidence and to draw the permissible inferences from that evidence. I do not believe the district court's finding of intentional discrimination was clearly erroneous and I would affirm.

The district court discredited Johnson's explanation for not retaining Day and Hollowell. Although the court acknowledged that

---

[1]I concur in the majority opinion with respect to the plaintiffs' section 1983 free speech claim.

-15-

the new facility was severely overcrowded, there was evidence that neither plaintiff was solely responsible for the problems at the jail.  The court found that Day and Hollowell attempted to address the problems, but that they were met with lack of cooperation from other county officials and delay caused by the lawsuit over control of the jail.  Particularly Hollowell, who was not even in charge of intake at the jail until after the conditions were publicized, could not be considered responsible for the problems at the jail. The district court also found the circumstances surrounding Johnson's decision not  to retain Day and Hollowell suspicious: Johnson knew very little about either Day or Hollowell when he decided not to retain them and he replaced them with white men whose experience and qualifications paled in comparison to those of Day and Hollowell.  Having rejected Johnson's proffered reasons for his employment decisions and finding the circumstances surrounding those decisions indicative of discriminatory intent, the district court's ultimate finding of intentional discrimination was not clearly erroneous.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.