Charles Theodore **DENESHA**, Plaintiff,

v.

**FARMERS INSURANCE EXCHANGE,**
Defendant.

**No. 95–0122–CV–W–BD.**

United States District Court,
W.D. Missouri,
Western Division.

July 28, 1997.

Dennis E. Egan, I, The Popham Law Firm, P.C., Kansas City, MO, Martin M. Meyers, The Meyers Law Firm, Kansas City, MO, for Charles Theodore Denesha.

Sharon D. Hess, Leonard Singer, Bioff, Singer & Finucane, Kansas City, MO, for Farmers Group Inc., Farmers Ins. Exchange.

## ORDER

HAYS, United States Magistrate Judge.

Following a nine day jury trial, plaintiff's claims pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 626, *et seq.*, and the Missouri Human Rights Act, Chapter 213 R.S.Mo. (MHRA), were submitted to the jury through a series of questions pro-

pounded by Verdict Forms A, B and C. On June 20, 1996, the jury returned a verdict in favor of plaintiff Denesha finding that age was a determining factor in defendant Farmers Insurance Exchange's decision to not give plaintiff a salary increase in December 1992 and that the conduct was willful. Punitive damages were not awarded on this claim. (Verdict Forms A and B) The jury also found that age was a determining factor in defendant's decision to discharge plaintiff and that the conduct was willful. On this claim, the jury awarded punitive damages of four million dollars. (Verdict Forms A and C) The jury awarded plaintiff actual damages of $102,614 for defendant's failure to give plaintiff a salary increase and for defendant's discharge of plaintiff. The jury found in favor of defendant on plaintiff's claim that plaintiff's filing of an EEOC charge was a determining factor in the decision to discharge plaintiff. (Verdict Form A)

Pending before the Court are:

(1) In Response to the Amended Judgment, Defendant's Second Amended Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial or, in the Further Alternative, for Remittitur of Punitive Damage Verdict (doc # 111);[1] and

(2) Plaintiff's Motion for Further Equitable Relief and Judgment Under the Age Discrimination in Employment Act and the Missouri Human Rights Act (doc # 102). Extensive briefing has been submitted in support of and in opposition to these motions.

## I. DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

In support of its Second Amended Motion for Judgment as a Matter of Law, defendant argues that: (1) plaintiff failed to prove that his age was a determining factor in defendant's decision to deny plaintiff a salary increase; and (2) plaintiff failed to prove that his age was a determining factor in defendant's decision to discharge him.

### A. Applicable Legal Standards

■ The parties' briefing reflects a sharp division about what inferences the jury may reasonably draw from the evidence. It is for the jury to draw the inferences from the overall evidence, not the Court. This is particularly true where conflicting inferences may be drawn. Plaintiff must be given the benefit of all reasonable inferences. A reasonable inference is one " 'which may be drawn from the evidence without resort to speculation.' " *Hopper v. Hallmark Cards, Inc.*, 87 F.3d 983, 987 (8th Cir.1996) (citations omitted).

■ The Court must view the evidence in the light most favorable to plaintiff, the prevailing party. Judgment as a matter of law is only appropriate if all the evidence points one way and is susceptible of no reasonable inference sustaining the non-moving party's position. *See Ricketts v. City of Columbia*, 36 F.3d 775, 778 (8th Cir.1994), *cert. denied*, 514 U.S. 1103, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995). This standard requires the Court to:

(1) resolve direct factual conflicts in favor of the nonmovant, (2) assume as true all facts supporting the nonmovant which the evidence tended to prove, (3) give the nonmovant the benefit of all reasonable inferences, and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn.

*Pumps & Power Co. v. Southern States Indus., Inc.*, 787 F.2d 1252, 1258 (8th Cir.1986), *cited with approval in Larson v. Miller*, 76 F.3d 1446, 1452 (8th Cir.1996).

### B. Factual Summary

Defendant's Second Amended Motion for Judgment as a Matter of Law involves an analysis of a number of factual issues which were disputed throughout the trial. The following is a brief summary of the facts with all factual issues having been resolved in

---

1. On July 8, 1996, defendant filed a Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial or, in the Further Alternative, for Remittitur of Punitive Damage Verdict. Later that same day, defendant filed an amended motion. The Clerk's Judgment of June 20, 1996 was amended on June 25, 1996 to include the jury's findings that defendant's actions were willful. The Second Amended Motion was filed in response to the Amended Judgment.

accordance with the standards outlined above.

In October of 1992, plaintiff was 55 years old. He had been employed as a claims representative by Farmers Insurance Exchange for seventeen years. Until he was transferred to the Kansas City Branch Claims Office (hereinafter "KCBCO"), he had never been placed on probation, had never been denied a raise and had never been given a formal warning. (Denesha direct) The Grandview Office was merged with the KCBCO in November 1992. Julie Clark, plaintiff's supervisor at the Grandview Office, did not continue as plaintiff's supervisor after the merger. However, Ms. Clark prepared plaintiff's initial performance evaluation for 1992.

Office Claims Representatives (OCRs) are entry level positions. OCRs generally have $2,000 or less in authority and work on property damages or theft, not bodily injury claims. (Terry Lee direct) Field Claims Representatives (FCRs) are given automobiles and leave the office to take statements, they can determine liability and they set reserves. (Lee direct) The March 22, 1993 annual evaluation for the KCBCO (Pl. Exh. 175) indicated that the case load for the FCRs in the office was unmanageable.[2] (Lee direct) According to Mr. Lee, the 1993 numbers did not show any one FCR as way behind. The entire office was having a problem meeting the company's goals and deadlines in categories such as ten day reports, status reports, 24-hour contact, etc.

In the last two performance evaluations at the Grandview Office, plaintiff's supervisor, Julie Clark, rated plaintiff as "very good." (Pl. Exhs. 157, 162) In September 1992, during his performance planning with Julie Clark, Ms. Clark told plaintiff that he was in 90% compliance with claims basics and that he was meeting expectations. He was recommended by his supervisor for the Metro claims program.

Plaintiff was not given a raise in 1992. In 1992, at the KCBCO, only plaintiff and Jack Mildfelt, who was two or three years younger than plaintiff, did not get raises. (John

White direct) The written performance evaluation for plaintiff dated December 4, 1992 stated:

> Your last appraisal was conducted in February 1992. Your overall rating was low very good. During 1992 you personally presented two cases to Special Arbitration. Your briefs were thorough and professionally presented. You obtained favorable results on both cases. Our Legal Department complimented you on your handling of negotiations of a litigated case at the pretrial settlement conference. You were able to settle case for $5000 less than our Legal Department had evaluated the case. File reviews indicate that your investigations are incomplete, your direct contact is lacking, 24 hour contact deficient, you generate numerous complaints with your failure to return calls. You need considerable improvement to assist the BCO in meeting it's service and cost goals. Your overall contribution at this time is medium-low.

(Pl. Exh. 5)

The document bears the signatures of Julie Clark and John White. Ms. Clark supervised plaintiff for eleven months of 1992. (Clark direct) When the Grandview and Kansas City offices were merged, Ms. Clark continued to supervise Vyck Shanes, but Joe Wilfong became plaintiff's supervisor. Julie Clark prepared the material in Plaintiff's Exhibit 5 to the sentence beginning "File reviews indicate ..." Ms. Clark did not prepare and was not consulted on the remainder of the material in Plaintiff's Exhibit 5 by John White. Ms. Clark recommended plaintiff for a 4% salary increase in 1992; her review was based upon her observations of plaintiff throughout 1992. (Clark direct) Plaintiff wrote Ms. Clark a memorandum asking her about the content of her review. Ms. Clark learned about the changes to plaintiff's 1992 evaluation from plaintiff, not John White.

John White was questioned about where the information in the review concerning complaints came from. At the time of his deposition, he said he thought the informa-

---

**2.** One of the recommendations of the report was to "[d]rastically reduce the case load of the field CRs to a manageable level."

tion was from the complaint log, although he really did not know. At trial, he testified that he had received complaints as had Mr. Lunn, his supervisor, and Mr. Wilfong. When shown that the complaint logs did not contain any written documentation, Mr. White indicated that he believed written documentation of the complaints during this time existed. Mr. White assumed that Julie Clark would meet with plaintiff and explain the 1992 salary review.

John White acknowledged that Farmers Insurance Exchange's procedures entitle an employee to know why a raise is denied. The procedure manual for Farmers requires that a supervisor meet with an employee to tell the employee why no raise is being given and to give the employee a timetable in which to improve. Mr. White did not meet with plaintiff to discuss his review. At the time that Mr. White modified Julie Clark's appraisal, she was out of the office for one day. Mr. White added the last three sentences on the form and signed Julie Clark's name as well as his. (White direct)

When Harold Moody reported to the KCBCO from Grandview in October 1992, his status reports were not current. (Moody direct) Upon Mr. Moody's transfer to the KCBCO from Grandview, Randy Funk became Mr. Moody's supervisor. Mr. Funk told Mr. Moody that the volume of cases was greater at the KCBCO and that Moody would be given an opportunity to get his files current according to Kansas City standards. (Moody direct)

Vyck Shanes, a FCR who also transferred to the KCBCO, had a discussion with Joe Wilfong over a disputed expense report in December 1992. At that time, Mr. Wilfong told Mr. Shanes that under the new system, the younger employees were running circles around the older ones. Vyck Shanes was given almost a year to get his files caught up after the move to the Kansas City office. (Shanes direct)

In 1992, Sean Leive was taken off assignments so that he could get caught up. (Wilfong cross) According to Mr. Wilfong, unlike plaintiff, Mr. Leive, who was less than forty years old, only had one problem; however, Mr. Wilfong acknowledged that plaintiff was never taken off assignments so that he could catch up.

In plaintiff's November case review, Mr. Wilfong did not mention any complaints involving plaintiff. In a case review with Joe Wilfong, plaintiff was told that the younger employees were running circles around the older employees. (Denesha direct) Plaintiff testified that Mr. Wilfong said this more than once. (Denesha direct) In connection with this discussion, Mr. Wilfong told John White that plaintiff had misinterpreted something he said. Mr. Wilfong acknowledged that he used the terms older and younger, but only in connection with the employees' time with the company. Mr. White told Mr. Wilfong that he should have used the words newer rather than younger. (John White direct)

In September 1992, Tammy Constance, then in her thirties, was placed on progressive discipline for failing to return phone calls and for falsifying investigative records for the second time in less than nine months. During 1991, Ms. Constance received four insurance department complaints and allowed two files to go into default. In December 1992, Mr. Wilfong wrote Ms. Constance that she had brought her performance up to acceptable levels. He concluded that 15 out of 15 ten-day reports were on time, most ten-day reports were complete as to investigation, there were no blank recordings, the AIR's were more timely and there were no complaints about unreturned phone calls. (Pl. Exh. 379) The Ten Day Report Review for November 1992 also showed that Ms. Constance's other numbers were: 24 Hour Contact—33.3%; 24 Hour Direct Contact—26.7%; and No Direct Contact—20%. (Pl. Exh. 409) These numbers were deemed sufficient by Mr. Wilfong to take Ms. Constance off formal warning.

In June 1993, plaintiff was placed on progressive discipline for failing to meet the 90% goals. Although management claimed that Denesha was last in all categories, plaintiff led the office in the reduction of bodily injury ("BI") costs. None of the other claims representatives in the entire office met all of the 90% goals, but only the oldest FCR was placed on progressive discipline.

Plaintiff contended that he received more assignments than anyone else. John White refused to review the records compiled by plaintiff which plaintiff claimed showed he had received an unfair number of assignments. Mr. White felt that plaintiff's documents were "bogus" and that he was a chronic complainer. (White direct) Similarly, Mr. Wilfong would not look at the numbers which plaintiff contended showed he was receiving more than his share of the assignments. From January through June 1993, plaintiff was assigned 300 BI units compared to 233 for Tammy Constance and 226 for Sean Leive. (Pl. Exh. 286) As of June 7, 1993, plaintiff received 16.8 units per week compared to 14.7 for Ms. Constance and 13.4 for Mr. Leive. (Pl. Exh. 353)

In January 1993, Mr. Wilfong began recording all complaints received against plaintiff. Younger FCRs received several verbal notices before Mr. Wilfong started writing them down.

Supervisors are required to conduct field rides with claims representatives they are supervising at least once each quarter. Mr. Wilfong's evaluation indicated that he had ridden with each claims representative each quarter. Mr. White assumed that he got this information from Mr. Wilfong; he did not look at the claims representatives' folders to make sure this had happened.

Riding with a claims representative is done as a tool to improve their efficiency. If a claims representative is having problems, it may be advisable to ride with them more than the minimum number of times required. Mr. White admitted that he would be shocked to learn that a branch claims supervisor supposedly experiencing performance problems with a FCR had failed to ride with that FCR the minimum of one time per quarter. Mr. Wilfong did not ride with plaintiff a single time during the eleven months he supervised him. Mr. Wilfong rode with Tammy Constance once per quarter as required by the procedures.

In March 1993, during a case review, plaintiff asked if he was doing the job and Mr. Wilfong said yes. Plaintiff wrote a memo to Mr. Wilfong on March 19, 1993 confirming this statement. (Pl. Exh. 15) In response, Mr. Wilfong wrote plaintiff asking the point of the letter. Mr. Wilfong further wrote that plaintiff was confused, that plaintiff should take better notes and that in the future, plaintiff should record their conversations so that he could listen to the tape and not rely on his memory. (Pl. Exh. 17) In a June meeting to which plaintiff brought a tape recorder, Mr. Wilfong put a file on top of the recorder and broke it.

On June 28, 1993, plaintiff was placed on formal warning. (Pl. Exh. 18) During an interim meeting in September, plaintiff was told that his probation would end on October 7, 1993 and that his performance would be reviewed at that time. Plaintiff did not complete his probation. (See Pl. Exh. 22) Plaintiff was commended for improving in particular areas, but was told that the problems outweighed the improvement. Mr. Wilfong admitted plaintiff had improved and that he had met five of the eight goals set for him. A handwritten note in September 1993 states that plaintiff's biggest problem was that he was not following up and settling claims. (White direct; Pl. Ex. 280) Plaintiff's Exhibit 12 shows that plaintiff settled the most BI units in September 1993.

Plaintiff was demoted on October 11, 1993 to an entry level OCR position. An OCR handles property damage claims by phone from the office. In addition to handling property damage claims, plaintiff was to oversee 800 to 1,000 subrogation files. Additionally, while some of plaintiff's BI files were initially reassigned, plaintiff continued to handle the bulk of the BI files, approximately 165 files. Plaintiff was told there was a possibility he would return to the field some day. On November 15, 1993, the subrogation and BI files were taken away from plaintiff and reassigned. On November 24, 1993, plaintiff was placed on formal warning. (Wilfong cross-examination)

During this time period, Mr. White characterized the workload as horrendous. Right around the time period that plaintiff was demoted to OCR, Mr. White was taking steps to make the workload of FCRs more manageable. Mr. White did not like the OCR position and did not intend to continue that position. After plaintiff was dismissed, the office was run without an OCR until a few

months before trial. (Wilfong cross-examination)

In March 1994, a regional office auditor observed that plaintiff had 100% of the time made 24–hour contact. However, Mr. Wilfong showed plaintiff making less than the goal of 90% of 24–hour contact for that same time period.

Terry Lee, a former Farmers Insurance Exchange employee, testified that in May or June of 1993, he sat by John White at a meeting. At that time, Mr. White advised him that the only way things would get better would be if he could get rid of the "old heads."

## C. *Prima Facia Case*

■ Defendant argues that plaintiff failed to establish a prima facia case that his age was a determining factor in defendant's decisions to not give plaintiff a salary increase in 1992 and to discharge plaintiff in 1994 because plaintiff cannot establish that his job performance met defendant's expectations or that he was adequately performing his job. (Defendant's Memorandum at 3, 10) Further, defendant argues that plaintiff cannot establish that he was replaced by a younger individual.

Plaintiff may make a prima facia case of discrimination using the method of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). As refined by the Supreme Court in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), plaintiff is entitled to an inference of discrimination if plaintiff can establish: (1) he was in a protected age group; (2) he met the applicable job qualifications or was satisfactorily performing his job; (3) he was discharged; and (4) after his discharge, the position remained open and his employer sought applicants with similar qualifications to fill the position. *See Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 776 (8th Cir.1995).[3]

However, plaintiff may always attempt to demonstrate a prima facia case by direct evidence of discrimination. *See Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 776 (8th Cir.1995). As the Eighth Circuit explained in *Perry v. Kunz*, 878 F.2d 1056 (8th Cir.1989):

> the trial court failed to recognize that an ADEA plaintiff is not required to prove a prima facie case utilizing only the so-called *McDonnell Douglas* method of proof, but may attempt to utilize either that indirect method of proof or may attempt to prove that age was a determining factor in defendant's decision to terminate her utilizing direct evidence.

*Perry*, 878 F.2d at 1058.

In *Perry*, the Eighth Circuit reversed the district court's grant of summary judgment in the employer's favor. The district court had concluded that the plaintiff could not establish a prima facia case using the *McDonnell Douglas* analysis because she could not establish that she performed her job at a level that met her employer's expectations.[4] However, there was evidence that the plaintiff's supervisors had said they had to let someone go, that the plaintiff was "up in age" and should go home and that they were doing her a favor by letting her go home. *Perry*, 878 F.2d at 1060–61. This testimony, plus evidence that the plaintiff had received good work performance evaluations for most of her twenty-year employment, entitled the plaintiff to have this issue submitted to the jury. *Id.* at 1061. As the Eighth Circuit explained:

> If the evidence consists of direct testimony that the defendant acted with a discriminatory motive, and the trier of fact

---

**3.** Using this method of proof, plaintiff's presentation of a prima facie case creates a legal presumption of unlawful discrimination. This presumption places an obligation upon the employer to produce evidence of a legitimate, nondiscriminatory reason for the plaintiff's discharge. If the employer carries this burden, the legal presumption of unlawful discrimination "drops out of the picture." *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

**4.** A Personnel Advisory Board has concluded that the plaintiff was incompetent, inadequate, careless or inefficient in the performance of her work duties and that she failed to meet the minimum standards required of her job. *See Perry*, 878 F.2d at 1058. The district court found that plaintiff was collaterally estopped from relitigating this issue.

accepts this testimony, the ultimate issue of discrimination is proved. Defendant cannot refute this evidence by mere articulation of other reasons; the legal standard changes dramatically: "Once an [illegal] motive is proved to have been a significant or substantial factor in an employment decision, defendant can rebut only by proving by a preponderance of the evidence that the same decision would have been reached even absent the presence of that factor."

*Id.* at 1061–62 (citations omitted).

Thus, defendant is not entitled to judgment as a matter of law on the basis that plaintiff could not make a prima facia case of age discrimination.

### D. *Intentional Discrimination*

■ Defendant argues that plaintiff failed to prove that his age was a determining factor in defendant's decision to not give plaintiff a salary increase in 1992 and to discharge plaintiff in 1994.

In support of these arguments, defendant claims that the decision to deny plaintiff a salary increase was made by Mr. White, the Branch Claims Manager, based upon an audit of plaintiff's closed files which were randomly selected. Defendant claims that Mr. White used the same factors to assess the performance of Harold Moody and Vyck Shanes who were younger than plaintiff.

Defendant also argues that it had the right to discharge plaintiff based upon his work as an OCR. Defendant claims that plaintiff failed to prove that as an OCR his work was as good as the other OCRs, Jack Dunlap and Pat Leonard. (Defendant's Memorandum at 12–13) Moreover, defendant points out that the work standards applied to plaintiff were job related, the work load was manageable, and his work was poor. According to defendant, plaintiff did not attend to his files, did not contact "A" and "B" parties as expected and caused a huge number of consumer complaints. (Defendant's Memorandum at 10–13)

■ Contrary to defendant's assertion, the fact that defendant has offered legitimate reasons for plaintiff's failure to receive a salary increase and for his dismissal does not automatically entitle defendant to judgment as a matter of law. Even when the employer produces a nondiscriminatory reason for its actions, the elements of the prima facie case, or in this case direct evidence of discrimination, if accompanied by evidence of pretext and disbelief of the defendant's proffered explanation, may permit the jury to find for the plaintiff. *See Ryther v. KARE 11,* 108 F.3d 832, 837 (8th Cir.), *cert. denied,* ── U.S. ──, 117 S.Ct. 2510, 138 L.Ed.2d 1013 (1997).

Defendant's version of the reasons for plaintiff's discharge was presented by various defense witnesses such as John White and Joe Wilfong and is summarized in various documents. (*See, e.g.,* Def. Exhs. 86, 90, 254) As set forth by defendant, on May 9, 1994, Joe Wilfong wrote to John White recommending that plaintiff be terminated. In this memorandum, Mr. Wilfong references a closed file audit in which plaintiff met only one goal and came close to only two others. Mr. Wilfong also noted that plaintiff had a "very high number of justified complaints" and an attitude "which to sum up is very negative." (Def. Exh. 254) Mr. White forwarded Mr. Wilfong's memorandum along with his own recommendation that plaintiff be terminated to Larry Lunn, Regional Claims Manager. Mr. White concurred in Mr. Wilfong's recommendation and requested authorization to terminate plaintiff. (Def. Exh. 254) According to Mr. White, plaintiff was "currently only meeting one goal and for the most part his performance has deteriorated during the current probationary period. His attitude is definitely a problem as he seems to have lost all interest." (Def. Exh. 254)

Defendant stresses that plaintiff has not attempted to refute and cannot refute the consumer complaints and other statistics pulled from the case files on which defendant claims to have relied in terminating plaintiff. Moreover, defendant contends that the legitimate, nondiscriminatory reasons for plaintiff's discharge pertained to his work as an OCR. Thus, defendant argues that its treatment of plaintiff as a FCR cannot tend to prove age discrimination against him in connection with his discharge from the OCR job.

■ Contrary to defendant's arguments, defendant's conduct throughout the course of plaintiff's employment with the company may be analyzed by a jury in assessing whether the proffered reasons for the adverse employment action constitute pretext and whether there was intentional discrimination. In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973), the Court noted that "evidence that may be relevant to any showing of pretext includes facts as to the [employer's] treatment of [plaintiff] during his prior term of employment." Here, the individuals who recommended and sought permission to terminate plaintiff, Mr. Wilfong and Mr. White, were the same supervisors whom the jury was entitled to conclude had made age based comments and had treated plaintiff more harshly as a FCR than other younger individuals.

### 1. *Comments Of Mr. Wilfong*

■ Defendant contends that because there was no evidence that Mr. Wilfong treated any similarly situated younger person differently than he treated plaintiff, Mr. Wilfong's alleged comments cannot prove discrimination. (Defendant's Memorandum at 26) Further, defendant argues that Mr. Wilfong's comments were made seventeen months before plaintiff's discharge, that they have no connection to the discharge and that they were the comments of a non-decisionmaker. (Defendant's Memorandum at 26–27)

The cases cited by defendant do not support its argument that, in the circumstances of this case, the Court cannot consider Mr. Wilfong's comments in determining if sufficient evidence of discriminatory animus was presented. In *Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444, 449 (8th Cir.1993), one of several cases relied upon by defendant, the court found that corporate planning documents, authored by an individual who participated in the decision to terminate the plaintiff, which contained statements that the company's strength included "young managers" and that "top and middle managers are mostly young, well educated and results oriented" were evidence of a discriminatory animus.

Defendant urges the Court to characterize Mr. Wilfong's comments as a "stray remark" as was made in *Stokes v. City of Omaha,* 23 F.3d 1362 (8th Cir.1994). However, in *Stokes,* the "stray remark" was asking the plaintiff his age during his interview. The court concluded that this isolated question, although improper, was not sufficient to support a finding that the plaintiff was not promoted because of his age. *Id.* at 1367. In this case, the comments of Mr. Wilfong were made not only to plaintiff, but to others and cannot be characterized as an isolated question.

Defendant relies on *Frieze v. Boatmen's Bank of Belton,* 950 F.2d 538 (8th Cir.1991), for the proposition that comments which are remote in time to the discriminatory event should not be considered. In *Frieze,* four years before the plaintiff was fired, he had a general discussion with the bank president about their respective goals. The bank president told the plaintiff that he had waited too long to start his effort towards becoming president of a bank and that he would not reach this goal. *Id.* at 541. This remark about the plaintiff's chances of becoming a bank president were considered insufficient to create an inference of discrimination when the plaintiff was terminated four years later for an act of insubordination. In this case, Mr. Wilfong's statements were made to plaintiff and to Vyck Shanes during a time period in which plaintiff contends Mr. Wilfong engaged in discriminatory evaluations of his work and treated him differently than younger employees he supervised. Thus, Mr. Wilfong's comments cannot be characterized as stray remarks, nor were they remote in time from the alleged discriminatory event.

The comments of Mr. Wilfong are more akin to those discussed in *Neufeld v. Searle Laboratories,* 884 F.2d 335 (8th Cir.1989). In that case, the plaintiff's supervisor was alleged to have told others that younger sales agents were more productive and more aggressive, that the younger sales agents in Indianapolis were "kicking your ass" and that the Indianapolis district manager had gotten rid of the older people and hired younger people and that he was trying to do

that as well. *Id.* at 338. In *Neufeld,* the defendant argued that these statements, if correctly interpreted, are only an exhortation to work harder or that they were merely statements of fact. The court noted that Searle Laboratories had an opportunity to argue its interpretation of the facts to the jury and that it was not up to the court to overturn the jury's harsher but equally plausible interpretation of the statements. *Id.* at 339.

Mr. Wilfong, as the supervisor who recommended plaintiff's termination, was sufficiently associated with the decision making process that his statements are relevant to the issue of intentional discrimination.

### 2. *Pretext*

Further, in demonstrating pretext, it is not necessary that a plaintiff disprove the factual basis for the employer's stated reasons for the discharge. As explained in *Nahrebeski v. Cincinnati Milacron Marketing Co.,* 835 F.Supp. 1130 (W.D.Mo.1993), *appeal dismissed,* 41 F.3d 1221 (1994):

> Thus, as the court reads *Hicks,* a plaintiff may show that an employer's stated reason for a decision is a "pretext for discrimination" either by showing that the stated reason is factually false (e.g., an employee was not late for work, as claimed) or by showing that the stated reason is false in the sense that it was not the real reason for the employer's actions (e.g., the employee was late, but was actually fired because of race, gender, or age). This view is consistent with the broader teaching of *Hicks*: whether an employer's stated reasons are "true" or "false" is only a secondary inquiry; the paramount question is whether a preponderance of the evidence persuades the trier of fact that the plaintiff has been the victim of unlawful discrimination.

*Id.* at 1135. Thus, for plaintiff to prevail it is not necessary that plaintiff attempt to show that there were no customer complaints or that plaintiff performed all aspects of claims basics better than Mr. Wilfong's evaluations would indicate.

In addition to meeting his initial burden by direct evidence of discrimination, i.e. evidence of statements by Mr. White and Mr. Wilfong that showed age bias, plaintiff offered evidence that he had not been treated as favorably as other younger FCRs. For example, plaintiff's supervisor failed to conduct field rides with him as he did with other FCRs and as he was required to do. These field rides were designed so that a supervisor could assist FCRs with any problems they were experiencing in their performance. Younger FCRs were given time off from new assignments to catch up on their work. Further, when plaintiff was first transferred to an OCR position he was left with a significant number of his other files. While these files were ultimately transferred to a FCR for handling, plaintiff was placed on probation just six days after these additional duties were removed from him.

### 3. *The Employer's Business Judgment*

Defendant contends that if this verdict is allowed to stand:

> employers will be coerced into tolerating employees' irresponsible and unproductive behavior rather than risk an outrageous result. . . . This verdict threatens the viability of all employers and, thereby, the well-being and security of conscientious employees.

(Defendant's Memorandum at 2) Throughout the course of the briefing, defendant has presented this case as involving issues concerning the termination of subpar employees such as: (1) whether an employer may discipline and terminate poor performing employees regardless of their age; (2) whether defendant presented evidence in support of its claim that plaintiff was a poor performing employee; and (3) whether an employee's poor performance can constitute a defense to a prima facia case of age discrimination.

The Eighth Circuit has addressed similar arguments that juries should not be allowed to second-guess an employer's business judgment. While the Eighth Circuit has recognized that the courts have "no business" telling an employer how to make personnel decisions:

> it is the essence of the fact-finder's duty in an age-discrimination case to decide whether the employer's proffered reason for discharge was its actual motivation. An employer cannot use the "objective" nature of its proffered criteria for person-

nel decisions to insulate itself from skeptical inquiry by the trier of fact. *Neufeld v. Searle Laboratories,* 884 F.2d 335, 340 (8th Cir.1989).

Contrary to defendant's assertion, no one has questioned the right of an employer to discipline and ultimately terminate poor performing employees. The jury was expressly told than an employer has the right to fire someone regardless of age if the decision is based on factors other than the employee's age. Further, the jury was told that even if they found an employment decision was harsh or unreasonable or wrong, it would not be unlawful if age was not a determining factor in the decision. (*See* Jury Instruction Nos. 17, 20)

The issue before this Court is whether there is sufficient evidence from which a jury could find that intentional discrimination and not the reason advanced by the defendant, i.e. poor performance, was the reason for plaintiff's termination.

### E. *Willful Violation Of The Act*

■ Defendant argues that the verdict of willfulness is not supported by any evidence in the record:

> The evidence is that Farmers has a policy against age discrimination, that its managers knew of the age discrimination prohibition and that procedurally, all proper steps were taken, including the approval of higher management at the regional level, to refuse a pay increase for Denesha in December 1992 and, at the home office level, to discharge Denesha in May 1994.

(Defendant's Memorandum at 29) Defendant further argues that if all a plaintiff need prove is that the employer had a policy and knew of the prohibition against age discrimination "willfulness will always be present in the case of a well managed company and the purpose of the ADEA will be negated as employers will have an incentive to not educate its managers about the law." (Defendant's Memorandum at 29)

The ADEA provides that "liquidated damages shall be payable only in cases of willful violations of this chapter." 29 U.S.C. § 626(b). In *Trans World Airlines. Inc. v. Thurston,* 469 U.S. 111, 128–29, 105 S.Ct. 613, 625–26, 83 L.Ed.2d 523 (1985), the Supreme Court held that an employer's violation of the ADEA is "willful" if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." The Eighth Circuit has interpreted *Thurston* to mean that if the people making the employment decision know that age discrimination is unlawful and if there is direct evidence of age-based animus, the trier of fact may properly find that the action was willful. *See Beshears v. Asbill,* 930 F.2d 1348 (8th Cir.1991).

In this case, both Mr. White and Mr. Wilfong admitted they were aware of the ADEA's requirements and there was direct evidence of discrimination. Defendant is not entitled to judgment as a matter of law on the issue of whether its conduct was willful. Substantial evidence supported the jury's finding on this issue.

### F. *Entitlement To Punitive Damages*

■ Defendant argues that plaintiff is not entitled to an award of punitive damages because defendant's alleged conduct was not outrageous and shocking. Additionally, defendant contends that because the alleged conduct was not part of a pattern of misconduct, the punitive damage verdict is grossly excessive and violated defendant's right to due process. As additional grounds for reducing the punitive damage verdict, defendant also maintains that the punitive damage verdict bears no relationship to any harm to plaintiff, that it violated due process because it exceeded the fines available for similar misconduct and that it grossly exceeded any amount necessary to punish defendant for its conduct. Finally, defendant argues that plaintiff cannot recover both liquidated damages under the ADEA and punitive damages under the Missouri Human Rights Act.

While conceding that plaintiff cannot recover both liquidated and punitive damages, plaintiff contends that he should receive the greater of the two awards. In all other respects, plaintiff contests the legal rationale advanced by defendant for reducing or eliminating the punitive damage award.

After reviewing all of the evidence presented in light of the most recent Eighth Circuit precedents, the Court concludes that insuffi-

cient evidence exists to support a punitive damage award. Accordingly, defendant's motion for judgment as a matter of law is granted as to the punitive damage award.[5]

The Court's conclusion that sufficient evidence of a willful violation existed is not inconsistent with the Court's conclusion that punitive damages are not warranted in this case. As the Eighth Circuit has explained:

"The standards established by the Missouri Supreme Court for finding punitive damages under the [MHRA] are entirely different" from the standards for imposing liquidated damages under the ADEA. *Doyne v. Union Elec. Co.*, 953 F.2d 447, 450 (8th Cir.1992). An employer who demonstrates reckless disregard for its compliance with the ADEA does not necessarily act in a manner that is "outrageous," which is necessary for the imposition of punitive damages. Stated another way, the Missouri law of punitive damages requires actual outrageousness, which is not present in the ADEA's concept of willfulness.

*Nelson v. Boatmen's Bancshares, Inc.*, 26 F.3d 796, 804 (8th Cir.1994).

In *Nelson*, the plaintiff was 61 years old and a 37–year employee of Boatmen's Trust at the time of his termination. He was the oldest of the securities traders and the only person whose position was eliminated. Moreover, he had been told his job was safe and that he would have some input into how the consolidated trading department was set up. He was later told that he would be evaluated and that if he received a low evaluation, he would be given a chance to raise it. Mr. Nelson had received raises for the past five years based on merit and offered testimony of his superior abilities and qualifications as a securities trader. There was evidence that at the time he was told by the senior vice-president, Thomas Darnall, that he would be given an opportunity to correct any problems with his evaluations, Mr. Dar-

nall had already made a decision to terminate him. The court concluded that these facts were not sufficiently outrageous to support an award of punitive damages.

In *Glover v. McDonnell Douglas Corp.*, 981 F.2d 388 (8th Cir.1992), the evidence at trial demonstrated that the employer retained younger workers, used age as a factor in its layoff decisions and told the plaintiff following his layoff that he would not be considered for a move to another subsidiary because of his age. The Eighth Circuit concluded that there was insufficient evidence to support a punitive damage award noting that not all violations of the Missouri Human Rights Act automatically entitle a plaintiff to punitive damages. *Id.* at 396.[6]

By contrast, in this case, even viewing the evidence most favorably to plaintiff, it is undisputed that defendant was experiencing performance problems with plaintiff. Months prior to his termination, all case files, except those normally handled by an OCR, had been transferred to others. Plaintiff's salary and benefits were not reduced. At the time of plaintiff's termination, defendant had received a number of complaints concerning plaintiff. The issue of liability was extremely close—another jury could have found that age was not the determining factor in defendant's decision to terminate plaintiff. Such a finding, like the finding of the jury in plaintiff's favor in this case, would have been supported by the evidence and the inferences the jury drew from that evidence.

■ While it was appropriate for the jury to decide the issue of liability and the jury's decision is supported by the evidence, viewing the facts in the light most favorable to plaintiff, punitive damages require more than a showing that intentional unlawful discrimination was more likely than not the reason underlying the adverse employment decision.

---

5. Given the court's finding on this issue, it is unnecessary to address the other challenges to the punitive damage award raised by defendant.

6. The Supreme Court vacated and remanded for reconsideration in light of *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). *See Glover v. McDonnell Douglas Corp.*, 510 U.S. 802, 114 S.Ct. 42, 126 L.Ed.2d 13 (1993). On reconsideration, the

Eighth Circuit concluded that the discussion in *Hazen Paper* was relevant only to the issue of whether a violation was willful. Thus, the court's earlier decision on punitive damages was not modified and punitive damages were reversed because there was no evidence of evil motive or reckless indifference. *See Glover v. McDonnell Douglas Corp.*, 12 F.3d 845, 848 (8th Cir.), *cert. denied*, 511 U.S. 1070, 114 S.Ct. 1647, 128 L.Ed.2d 366 (1994).

See *Tincher v. Wal–Mart Stores, Inc.*, 118 F.3d 1125, (7th Cir. 1997); *Karcher v. Emerson Elec. Co.*, 94 F.3d 502, 509 (8th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1692, 137 L.Ed.2d 820 (1997). Thus, the Court finds that defendant is entitled to judgment as a matter of law on the punitive damage issue.

### G. *New Trial*

■■■ The decision whether to grant a new trial is within the discretion of the trial court, but generally new trials are granted only if the record presents prejudicial error or if substantial justice has not been done. *See Comerio v. Beatrice Foods Co.*, 616 F.Supp. 1423, 1428 (E.D.Mo.1985). Defendant has not satisfied this standard.

## II. *PLAINTIFF'S MOTION FOR FURTHER EQUITABLE RELIEF*

Plaintiff seeks equitable relief in the form of front pay through his 65th birthday totaling $379,321.66. Additionally, plaintiff's counsel seeks attorneys' fees and costs in the amount of $138,718.34.

Defendant maintains that plaintiff is not entitled to front pay because he did not submit the issue of the amount of front pay to be awarded to the jury, because there is no evidence to support a front pay award and because any such award would be an excessive and improper windfall. Finally, defendant claims that the amount of requested attorneys' fees is unreasonable and offers a number of suggestions for the reduction of the fees.

### A. *Front Pay*

■■■ Defendant acknowledges that whether a plaintiff should be reinstated is an equitable issue for the court, but cites cases from the Third, Sixth and Ninth Circuits suggesting that the amount of front pay to be awarded should be submitted to the jury.

The Eighth Circuit has recently resolved this issue. In *Newhouse v. McCormick & Co.*, 110 F.3d 635, 643 (8th Cir.1997), the court stated: "We ... expressly hold that front pay, including the determination of how much front pay to award, is an equitable issue for the court." Therefore, the Court

will determine the amount of front pay to be awarded.

Defendant next argues that plaintiff failed to offer evidence to support a front pay award on issues such as plaintiff's intention to continue working or the scope of any planned employment search. (Defendant's Suggestions in Opposition to Plaintiff's Motion for Further Equitable Relief at 3) Defendant offered two affidavits on the issue of plaintiff's employment options in the insurance field and notes typed by plaintiff that suggest he intended to remain with the company until age 62, not age 65. In reply, plaintiff urges the Court to presume that plaintiff would have remained employed until age 65. (Plaintiff's Reply at 2) Additionally, plaintiff argues that the notes were not admitted into evidence. (Plaintiff's Reply at 4) While plaintiff in his reply suggestions takes the position that there is substantial evidence to support a front pay award, plaintiff originally made the following request: "To make Plaintiff Ted Denesha whole, this Court must hold a hearing to determine appropriate *future* relief—whether he is entitled to reinstatement or front pay in lieu thereof." (Plaintiff's Motion for Further Equitable Relief at 3)

Had the parties stipulated to the affidavits, notes and other evidence to which the parties refer in their briefing, a hearing would not be necessary. However, based on the parties' briefing, the Court believes the parties are opposed to the Court considering the issue based on the affidavits, notes and other evidence as submitted. Thus, a hearing will be set as soon as possible on this issue. The parties should be prepared at that time to present any evidence they wish the Court to consider on the issue of reinstatement or front pay. Should the parties reach some stipulation as to the evidence and affidavits that can be considered on this issue, they should immediately advise the Court that a hearing is unnecessary.

### B. *Attorneys' Fees*

Defendant opposes plaintiff's requested attorneys' fees suggesting that they should be substantially lowered. Defendant makes several arguments including: (1) that plain-

tiff cannot recover fees related to his unsuccessful retaliation claim; (2) that plaintiff cannot recover fees for duplicative efforts of multiple attorneys; (3) that the fee statements are not adequately detailed; (4) that plaintiff cannot recover fees incurred for presenting a mock trial to a focus group; (5) that there is insufficient support for the hourly rates claimed; (6) that attorney rates cannot be recovered for clerical duties; and (7) that a reduction in the fee award is appropriate because the amount of a confidential settlement was improperly disclosed.

Plaintiff has submitted the following in support of his attorney fee request: (1) Affidavit of Dennis E. Egan and time sheets of the Popham Law Firm; (2) Affidavit of Martin M. Meyers with attachments, including an opinion of Judge Joseph E. Stevens, Jr. and time sheets of the Meyers Law Firm; (3) Affidavit of Dianne McGovern, Office Administrator of the Popham Law Firm; (4) Affidavit of Sue Phillips; and (5) Affidavit of Kelly L. McClelland.

While defendant maintains that the affidavits submitted by plaintiff do not demonstrate that any counsel has actually been paid by a client the hourly rates they claim, there has been no objection to the Court's consideration of the evidence submitted on the attorney fee issue. Neither party has requested an opportunity to present evidence on the attorney fee issue. Thus, the Court will decide this issue on the basis of the information presently before it.

1. *Applicable Legal Standards*

Prevailing plaintiffs in ADEA cases are entitled to reasonable attorneys' fees. *See* 29 U.S.C. § 626(b) (incorporating 29 U.S.C. § 216(b)); *Brennan v. Ace Hardware Corp.,* 495 F.2d 368, 374 (8th Cir.1974).

In *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974), the court enumerated twelve factors that courts should consider when determining the amount of attorneys' fees to award in a Title VII case. The Eighth Circuit Court of Appeals announced its approval of these twelve factors in *Cleverly v. Western Electric Co.,* 594 F.2d 638, 642 (8th Cir.1979), a case involving the ADEA. The factors to be considered consist of: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or other circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson,* 488 F.2d at 717–19.

As set forth in *Roche v. City of Normandy,* 566 F.Supp. 37 (E.D.Mo.1983), courts should consider the factors in the following manner:

> First, a determination is made of the number of hours spent by plaintiff's counsel, and in what manner. Second, a value is placed on those services by consideration of the customary fee charged by plaintiff's counsel. Finally, this initial figure is adjusted by consideration of the remaining factors.

*Id.* at 41.

2. *Analysis Of Appropriate Fee*

a. *Hourly Rate*

■ Plaintiff's counsel seek compensation at the following hourly rates: Mr. Egan $200; Mr. Meyers $195; and Mr. Thornberry $50 prior to September 1995 and $90 after September 1995. Plaintiff's counsel refer to cases in which Mr. Egan was awarded $185 per hour in 1993 and Mr. Meyers $175 per hour in 1994. This Court has recently awarded fees of $150 per hour to similarly experienced counsel.

Defense counsel suggests that the hourly rate awarded plaintiff's counsel should be the same rate that he charges defendant, $125 per hour. However, defense counsel failed to advise whether this is the rate at which he bills all clients or a special rate negotiated with defendant. The Court's familiarity with the Kansas City market would indicate that $125 per hour would generally be below market rates for attorneys with the experience of plaintiff's and defendant's counsel. Defense counsel offers no other evidence to counter

the evidence of market rates presented by plaintiff's affidavits.

Based on this Court's prior awards and the rates allowed by other judges in the Western District of Missouri and the Eighth Circuit, the Court concludes that $170 per hour for both Mr. Egan's and Mr. Meyers' time would be reasonable. Counsel sought a $5 per hour difference in the fees apparently to compensate for Mr. Egan's greater trial experience. However, given that Mr. Meyers was lead counsel in the case until Mr. Egan began assisting him approximately one month prior to trial, the Court concludes that the same hourly rate for both counsel is appropriate.

There has been no suggestion that $50 and $90 per hour for Mr. Thornberry's time would be unreasonable and, thus, these rates will be awarded as requested.

### b. *Reasonable Time*

■ Defendant challenges a number of the items included in the attorney fee request. First, defendant argues that it should not have to pay for duplicative time or for Mr. Egan to learn about the file prior to trial. As defense counsel points out, Mr. Egan had 170 hours in the case compared to Mr. Meyers' 351.25. Mr. Egan did not become involved in the case until May of 1996, approximately one month prior to trial, and put on only two witnesses at trial, Vyck Shanes and Julie Clark. The Court will not require defendant to pay for time spent educating additional counsel about the case one month before trial. The time spent by Mr. Egan on May 14, 1996 (4.5 hours) and on June 6, 1996 (8.0 hours) will be excluded from the time awarded.

■ Likewise, the issues in the case were not so complex that they warranted three counsel for plaintiff throughout trial. Thus, at trial, defendant will be required only to pay for the time of Mr. Meyers and Mr. Egan. Mr. Thornberry's trial time of 62.25 hours will be excluded.

■ Next, defendant argues that plaintiff's counsel's time spent in conducting a

mock trial should not be borne by defendant. While plaintiff's counsel may believe that the mock trial enhanced their preparation and enabled them to make a more effective presentation, the case could certainly have been tried without this type of pretrial preparation. The Court will disallow all fees and costs associated with the mock trial as follows: Mr. Egan 1.0 hour on 5/22/96; Mr. Meyers 15.0 hours on 4/30/96, 5/1/96 and 5/2/96; Mr. Thornberry 30.5 hours on 4/29/96, 4/30/96, 5/1/96, 5/2/96 and 5/3/96.

■ Defense counsel next seeks to exclude $4,125 in attorneys' fees which defendant claims are clerical in nature. A review of Defendant's Exhibit 7, attached to Defendant's Suggestions in Opposition to Plaintiff's Motion for Further Equitable Relief, reflects a number of items for which defendant's objections appear well taken. (*See* entries of 4/12/95 (1.0 SCT, copying and mailing); 12/14/95 (.5 SCT, deliver interrogatory answers to defendant); 1/16/96 (.5 SCT, deliver exhibit index); 6/7/96 (1.5 SCT, transport television to courthouse); 6/8/96 (1.0 SCT, compile trial supplies); 6/9/96 (2.5 SCT, put defendant's exhibits in box)). Other time spent in organizing and preparing exhibits would seem to be appropriate for an associate familiar with the case. Thus, this time will not be excluded.

### c. *Unsuccessful Claims*

In *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the United States Supreme Court set forth standards for determining the proper amount of an award of attorneys' fees, including guidance on awarding fees where the plaintiff was not successful on all claims.[7] The Court stated:

> We hold that the extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees under 42 U.S.C. § 1988. Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his

---

7. The action to recover attorneys' fees in *Hensley* was brought under 42 U.S.C. § 1988. However, the reasoning in *Hensley* is "generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party.'" *Hensley,* 461 U.S. at 433 n. 7, 103 S.Ct. at 1939 n. 7. *See*

*Heiar v. Crawford County,* 746 F.2d 1190, 1204 (7th Cir.1984), *cert. denied,* 472 U.S. 1027, 105 S.Ct. 3500, 87 L.Ed.2d 631 (1985)(in assessing attorneys' fees in ADEA action, court should be guided by *Hensley* standards).

successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee. Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised. But where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained.

*Id.* at 440, 103 S.Ct. at 1943.

As set forth by the Eighth Circuit in *Easley v. Empire Inc.*, 757 F.2d 923 (8th Cir. 1985):

The Supreme Court has characterized the extent of a plaintiff's success as the "most critical factor" in adjusting fee awards, *Hensley*, 461 U.S. at 436 [103 S.Ct. at 1941], but has said that where claims go to common cores of facts and related legal theories, a district court is not required to mechanically apportion fees based on the number of issues on which the prevailing party was actually successful. *Id.* at 438 [103 S.Ct. at 1942]. The focus should be on "the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.* at 435 [103 S.Ct. at 1940].

*Easley*, 757 F.2d at 932. In a situation very similar to that before this Court, the United States District Court for the District of Minnesota found:

Because [plaintiff's] discrimination and reprisal claim share common facts and involve related legal theories, the fee award cannot be mechanically based on the success and failure of those claims. Rather, the court must examine the relationship between the significance of the overall relief obtained by plaintiff in relation to the hours reasonably expended on the litigation. It is obvious that [plaintiff] succeeded on the central issue of age discrimination and that, taking the scope of the litigation as a whole, [plaintiff] obtained the major part of the relief he sought. Thus, [plaintiff's] counsel "should recover a fully compensatory fee." *Hensley*, 461 U.S. at 435 [103 S.Ct. at 1940]. The court finds that the hours claimed to have been expended by [plaintiff's] counsel are reasonable given the overall result obtained.

*Ryther v. KARE 11*, 864 F.Supp. 1525, 1533 (D.Minn.1994).

▇▇▇ Defendant's argument that the award of attorneys' fees should be reduced because plaintiff did not prevail on his retaliation claim must be rejected. Despite plaintiff's unsuccessful retaliation claim, the court finds that overall plaintiff's counsel achieved excellent results, rather than only limited success. Given the overall results obtained by plaintiff's counsel, their fees should not be discounted for work done on the related retaliation claim.

The Court has reduced Mr. Egan's time by 13.5 hours, Mr. Meyers' time by 15.0 hours and Mr. Thornberry's time by 99.75 hours (30.5 hours relating to the mock trial, 7.0 hours for clerical duties and 62.25 hours attending trial). Thus, the total in attorney time awarded is $108,545.00: 156.5 hours or $26,605.00 for Mr. Egan; 336.25 hours or $57,162.50 for Mr. Meyers; and 299.75 hours or $24,777.50 for Mr. Thornberry.[8] Additionally, paralegal expenses of $82.50 and expenses of $1,084.09 are awarded, making the total award $109,711.59.[9]

## III. CONCLUSION

Based on the foregoing, it is

ORDERED that Defendant's Second Amended Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial or, in the Further Alternative, for Remittitur of Punitive Damage Verdict (doc # 111) is granted in part and denied in part as set forth above. It is further

ORDERED that Plaintiff's Motion for Further Equitable Relief and Judgment Under the Age Discrimination in Employment

8. Per plaintiff's request, Mr. Thornberry's time prior to September 1995 (55 hours) was awarded at the rate of $50.00 per hour and the remainder of his time was awarded at the rate of $90.00 per hour.

9. Those expenses relating to the mock trial have been deducted from the amount awarded.

Act and the Missouri Human Rights Act (doc # 102) is granted in part and denied in part as set forth above. Attorneys' fees and expenses in the amount of $109,711.59 are awarded. The issue of front pay is deferred pending a hearing on this issue. It is further

ORDERED that the parties are directed to confer and then advise the Court as to when they are available for a hearing on the issue of front pay. It is further

ORDERED that Defendant's Motion for Extension of Time to Respond to Plaintiff's Motion for Further Equitable Relief (doc # 112) is granted.