Barbara RAY, Plaintiff,

v.

WEYERHAEUSER, Defendant.

No. 97–6130.

United States District Court,
W.D. Arkansas,
Hot Springs Division.

Aug. 19, 1998.

Regina Haralson, Philip E. Kaplan, Kaplan, Brewer & Maxey, P.A., Little Rock, AR, for Plaintiff.

Kathlyn Graves, John G. Lile, Don S. McKinney, Wright, Lindsey & Jennings, Little Rock, AR, for Defendant.

### MEMORANDUM OPINION

DAWSON, District Judge.

This case is before the court on defendant's motion for summary judgment. Plaintiff, Barbara Ray (Ray), filed this sex discrimination action against her former employer, Weyerhaeuser, under the provisions of Title VII on August 8, 1997. Ray also asserts a supplemental state law claim under the Arkansas Civil Rights Act. Trial is currently set for the week of February 8, 1999.

### Background.

Ray had two different periods of employment with Weyerhaeuser at its Mountain Pine plywood mill. First, she worked for defendant in a variety of positions in the general labor pool from 1977 to some point in 1982 when she resigned her position. This resignation was unrelated to any allegations of discrimination on defendant's part. Second, she was rehired in November of 1982. Ray worked in a variety of positions including relief supervisor of the green end until she was promoted to supervisor effective November 24, 1989.[1]

Ray has no complaints of sex discrimination prior to her promotion in 1989. *Ray Deposition at* 22. Once promoted to a super-

visory position, Ray received supervisory training. She has no complaints regarding the training she was provided. *Id. at* 25.

The Mountain Pine plywood mill is divided into three basic activities: green end, dry end, and finishing. *Welch Affidavit at* ¶ 3. On the green end, logs are soaked in vats of water and heated. *Id.* The heated logs are then placed on a lathe where they are rotated while sheets of veneer are peeled from the log. *Id.* The sheets of veneer are then placed in dryers where the moisture content is reduced. *Id.* On the dry end of the production line, the dried veneer is sorted into one of thirteen grade and moisture categories. *Id.* The sorted veneer is then crossbanded, layered, and glued while pressure and heat are applied to create a secure bond. *Id.* The finishing end of production prepares the plywood product for shipment. *Id.* The plywood mill typically runs around the clock in three shifts. *Id.*

When Ray was first promoted, Dave Walsh was plant superintendent and her immediate superior. *Ray Deposition at* 28. Ray was first assigned to the graveyard shift, green end/dry belt. *Id.* In this position, she had supervisory authority over 30 or 35 people. *Id. at* 29.

From the time of her promotion, Ray contends management made sexist remarks. Ray provides the following examples of sexist remarks and/or actions: (1) Walsh would introduce Brian McKenna as the dry end supervisor but introduce her as the one who "dabbles in housekeeping over here;" (2) Walsh would come up and stick his finger in her ear, or place his arm around her shoulders, or during meetings would grab her knee, squeeze it, and then remove his hand;[2] (3) during a meeting, Walsh opined that something made as much sense as "tits on a boar" and then added, "No offense, Barbara;" and (4) during another meeting, a male supervisor shed his outer coveralls, and Walsh said, "Take some more off, Barbara is

---

**1.** On April 21, 1987, her performance as relief supervisor was described by the plywood superintendent as "nothing less than excellent." *Plaintiff's Exhibit* 1.

**2.** Ray also observed Walsh performing other types of irritating conduct. For instance, she observed him coming up behind the male supervisors and grabbing their rear ends. *Ray Deposition at* 32.

getting really hot over here." *Ray Deposition at* 34, 30–33, and 34.

In her deposition, Ray testified all these incidents with Walsh occurred within a year of her having been promoted to supervisor. *Id.* at 35–36. Ray complained of this conduct to Jim Neal the human resources person at the facility. *Ray Deposition at* 35. Neal talked with Walsh and "evidently had a pretty nice talk with [Walsh], because [Walsh] did apologize to me. And I had no further problems with [Walsh]." *Ray Deposition at* 36.

Ray testified that James Taylor, green end coordinator, displayed a sexist attitude by seeking input from male supervisors but not from her, ignoring her opinions when she volunteered them, failing to inform her of crucial operational decisions, criticizing activity on her shift while disregarding the same activity on male supervisors' shifts, scheduling meetings on her day off, and undermining her authority by reassigning members of her crew. *Ray Deposition at* 62–72.[3] However, she also testified that other supervisors including Lewis Ivey, Charlie Lacaze, and Billie Orrell, had similar problems with Taylor. *Ray Deposition at* 64–66.

Orrell was the only other female supervisor during the time Ray served as supervisor. Orrell left defendant's employee because of personal problems some time before Ray's termination.

In July of 1992, Jimmy Welch (Welch) was employed by Weyerhaeuser as the Mountain Pine plywood mill superintendent. Prior to his employment with defendant, Welch had worked in supervisory positions for various other wood product companies. He and Taylor had worked together while both were employed at International Paper Company.

When defendant first approached Welch about coming to work for it at the Mountain Pine facility, Welch was told the plywood operation was nonproductive that the "housekeeping was horrible, the safety record was not good, the morale was terrible," and if

things didn't change defendant would close the mill. *Welch Deposition at* 19. When he first saw the plant, Welch found it to be even worse than he could have envisioned. *Id.* at 21. He initially told defendant that he didn't believe it was willing to invest the money necessary to improve the plant. *Id.* at 21–22. However, defendant approached Welch a second time and after some discussion he took the position. Once at Mountain Pine, Welch started replacing, renovating, and rebuilding. *Id.* at 23–24.

At the time Welch became superintendent, defendant was installing a new lathe on the green end. *Welch Affidavit at* ¶ 5. The lathe was state-of-the-art equipment which became operational in September of 1992. *Id.* The supervisors were responsible for learning many of the technical aspects of plywood production in order to maximize the potential for the new lathe. *Id.*

Although the plywood mill has the same lay-up line, the same presses, and the same dryers as it did in 1992, the production goals have steadily increased. *Welch Deposition at* 150. In 1992 the production target was 2,800,000 feet on a weekly basis. *Welch Deposition at* 150. By 1995, the goal had increased to 4,000,000 feet and the mill is currently producing at the rate of 5,000,000 feet. *Id.*

In Welch's opinion, employee morale was very low at the Mountain Pine mill. *Welch Affidavit at* ¶ 15. He heard that the prior managers employed harsh management skills or in Welch's words "management by intimidation" and that is not his style. *Welch Deposition at* 26–27.

Welch's goal was "[t]o make Mountain Pine plywood plant the best forest products company, to make Weyerhaeuser the best forest products company in the world, and to make Weyerhaeuser Mountain Pine Plywood the best one in the industry." *Welch Deposition at* 27. One of the things he wanted to accomplish was to create a less harsh climate for employees, to empower the hourly em-

---

**3.** Ray also testified that James Taylor made a pass at a female worker, Marisa Starr. *Ray Deposition at* 73–76. In her opinion, he seemed a little over friendly with women. *Id.* at 76. She believed he behaved inappropriately with some

of the women in the workplace. *Id.* However since no one complained to her and it didn't seem like the women minded, she didn't think the behavior would constitute sexual harassment and did not report Taylor to human resources.

ployees, and to thereby raise morale and increase productivity. *Id. at* 125. *See also Welch Affidavit at* ¶ 15. He maintained an open door policy which allowed employees to bring concerns to him regarding the workplace. *Welch Deposition at* 18–25.

According to Welch, his expectations for supervisors focuses upon their ability to motivate employees to work as a team and to take responsibility for the quality and amount of production. *Welch Affidavit at* ¶ 7. He requires his supervisors to possess both technical knowledge of plywood production and the ability to manage people. *Id.*

The production statistics are maintained for the plywood mill as a whole on a weekly basis and not by shift or supervisor. *Welch Deposition at* 138. Thus, Welch evaluates a supervisor's ability to motivate and manage employees based on how the supervisor handles various situations in the workplace, observations, and interactions with the supervisors over time. *Welch Affidavit at* ¶ 7.

A number of supervisors had difficulty adapting to Welch's management style. Over the next several years, Welch first counseled with and then terminated a number of supervisors. Specifically, he terminated Charles Lacaze, Lewis Ivey, Danny Baggett, and Barbara Ray. Two other supervisors Mike Avery and John Elliott left Mountain Pine.

Welch testified he had several counseling sessions with John Elliott because he was a "harsh hollerer" and even sent him to a supervisor training school. *Welch Deposition at* 122–26. Although he was "extremely competent and technically smart within the business," Elliott was given an ultimatum. *Welch Deposition at* 124. It was made clear to him that "his behavior had to change to stay in an acceptable level with Weyerhaeuser." *Id. at* 123. A few months later, Elliott chose to take a job with another company because his management style "may not fit within Weyerhaeuser." *Id. at* 124.

Welch had similar concerns with Avery. *Welch Deposition at* 127. Avery was verbally put on probation. *Id. at* 128. He then sought another position with a subsidiary of Weyerhaeuser because he didn't believe he was going to fit Weyerhaeuser's "changing mold of working more and giving more to the employees, empowerment." *Welch Deposition at* 128–29.

Welch terminated Charles Lacaze because of his conduct—treating employees in an unprofessional manner, "hollering," and using an abusive tone or abusive language. *Id. at* 39–40. Welch terminated Lewis Ivey because he was harsh and he "blew up" on the floor. *Welch Deposition at* 131–32. The first time he blew up on the floor, took his hat off and threw it on the ground and "hollered," he was suspended. He was terminated when he engaged in similar conduct a second time in an even more explosive manner. *Welch Deposition at* 131–32.

Welch testified Danny Baggett spent too much time on the phone and away from the floor. *Welch Deposition at* 119. Baggett was terminated after it was determined he contributed to the breakup of an hourly employee's marriage. *Id. at* 120–22.

In 1992 when Welch first came to Mountain Pine, Ray was a supervisor of the green end. As such, she was responsible for making sure all machines were being operated, were running properly, and that the veneer quality was acceptable. *Ray Deposition at* 49. She was also responsible for all employee issues on her shift including training and safety.

Ray testified that in December of 1993 she requested a transfer to the dry end lay-up department because of a personalty conflict with the green end coordinator, James Taylor. *Ray Deposition at* 57–64. Specifically, Ray testified she and James Taylor didn't "hit it off real well" and that she could "never do anything right" as far as Taylor was concerned. *Id. at* 59.

Greg Taylor, was the scheduler for the dry end for Ray's shift from December of 1993 until March of 1995. Ray apparently had no problems working with him and she states he had no complaints regarding her performance.

Welch testified he moved Ray to the dry end for development purposes and because she had not mastered the technical aspects of the new lathe and had difficulty managing

employees on her shift. *Welch Deposition at* 101–03. Ray had made several comments to Welch to the effect that "she wasn't responsible for being technical, just being out there to deal with the people."

From his arrival at the mill, Welch states he has had to coach and counsel Ray on numerous occasions on improving her technical knowledge, her communication with her crew and with management, and on her people management skills. *Welch Affidavit at* ¶ 8. Welch asserts that Ray had difficulty handling her employees in an evenhanded way and indicated he received complaints of favoritism, blowing up and losing her temper, yelling on the floor and failure to listen to employees. A number of employees utilized his open-door policy to express concerns about Ray's lack of knowledge concerning the new lathe. *Welch Deposition at* 102.

On January 25, 1995, Welch met with Ray to discuss her 1994 KRA (performance evaluation) and suggested a number of areas she needed improvement. He noted she needed to: (1) "Work on communications with employee's [sic] that are in hostile situations. Such as utilizing more tactful methods learned in supervisory training;" (2) "Work on forklift preventative maintanance [sic], checklist, and safe operation of the lifts. Also that operators work on items such as picking up 4 × 4's, streight [sic] rows of veneer, proper marking, and loads flat on floor;" (3) "Work on documentation of conversations with employee's [sic]. More detailed and specific to conversations that take place on [the] floor, about job performance, and also in the area of safety investigations." On a scale of zero to five, Welch gave Ray an overall rating of 3.10.[4]

Under the section entitled "manager's general comments," Welch wrote:

Barbara has gained knowledge of the dryer/lay-up area. The actual production numbers on second shift are good. The problem on this shift is the lack of confidence a significant number of her employ-

ees have in effectively communicating with her. They are going to the manager or human resource manager, making claims of favoritism, discrimination and harassment. The employee's [sic] must regain confidence in their supervisor. I am willing to assist in any way to help Barbara achieve this. Barbara does have the ability to achieve this task.

*Defendant's Exhibit* 4.

In response to a question asking what support she needed from others to improve her performance, Ray wrote that she needed "morale support. I need to know that others feel I am capable of making decisions. Too often decisions are made for me. I sometimes feel I am here only to relay messages. I want to feel as though I count!" *Id.* In response to a question of what she could do to improve her job performance, Ray wrote "[b]e more open-minded to suggestions. Less ready to defend myself against any criticism." In her deposition, Ray testified that although she didn't believe these comments she wrote them down "after months of being told that I needed to do these things." *Ray Deposition at* 166.

Ray contends her performance evaluations for 1993 and 1994 did not differ significantly from her male counterparts. She also asserts that the areas identified as needing improvement in her 1994 evaluation were similar to areas identified as needing improvement on the evaluations of her male counterparts. However, Ray only offers her bare assertions to support these statements. She does not submit the other evaluations for our review.[5]

In March of 1995, Ray received a 5.5% increase in her salary.[6] Ray states this is the highest raise in her history at defendant.

Also in March of 1995, John Elliott replaced Greg Taylor as scheduler. On March 20, 1995, Elliott reassigned a member of Ray's crew which in her opinion undermined

---

**4.** In 1993, Ray was given an overall rating of 3.12. *Plaintiff's Exhibit* 4.

**5.** Ray does indicate that she has requested this information in discovery but that defendant has resisted production. However, plaintiff made no

request under Rule 56(f) of the Federal Rules of Civil Procedure for an extension of time to complete discovery.

**6.** In March of 1993, Ray had received a 4.7% raise. *Plaintiff's Exhibit* 6.

her. Ray was upset by this incident and went to Welch about the problem.

In March of 1995, Welch discussed Ray's performance with Bobby Freeman (Freeman), human resources manager for the Mountain Pine complex. Welch was concerned that his verbal coaching and counseling with Ray regarding her performance was not effective. *Welch Affidavit at* ¶ 10. Freeman suggested the next step was to put Welch's concerns in writing and give Ray a probationary period to improve her performance. *Id.*

Welch prepared a memorandum outlining Ray's past problems and specific areas that needed improvement including the following: supervisor and employee relationships; technical knowledge base; ability to develop and foster high morale, enthusiasm and esprit de corps of her team; understanding of the objectives of her boss and department; keeping team members informed about aspects of their job, especially new employees; making sure her employees knew what their individual objectives are and how they fit into and contribute to the organizations objectives; the assignment of work, discipline, and rewards on an impartial basis that is known and understood by all team members; making a continual effort herself and soliciting suggestions from team members on work method improvements; and improving her personal self-confidence as a supervisor.

On April 13, 1995, Freeman and Welch met with Ray, reviewed the memorandum with her, and told her that if her performance did not improve she could be terminated. The probation provided that Welch would meet with Ray on a monthly basis and provide written feedback so she could know where she was in correcting the problems.

Ray testified that many of the incidents Welch mentioned "were completely foreign" to her. *Ray Deposition at* 125. In fact, she testified there were not many instances over the past two years where she had talked to Welch about job issues. *Id. at* 127. When questioned, Ray did recall Welch and/or other personnel having discussed the following issues with her: her need to develop her technical capabilities; her having failed to follow instructions; the core dryer production being unacceptable; problems with "dragback;" problems with "cold blocks;" problems with getting her paperwork turned in; accusations of favoritism, harassment and discrimination; and talking with two other supervisors about a problem with a third supervisor. *Ray Deposition at* 130–31, 135–36, 140, 142, 146, 158, 170.

Ray "was hurt, frustrated, probably a little angry" after the counseling session which occurred in connection with her receipt of the April 13th memorandum. *Ray Deposition at* 181. She tried to get in touch Norma Easton who worked in human resources at the corporate office in Hot Springs. *Id.* When she could not reach her, Ray talked with John Henry, who was also in human resources at the corporate office. *Id.* She told him she "had been placed on probation over things that [she] felt were unwarranted and unfair." *Ray Deposition at* 182. She did not tell him she thought she was being treated differently because she was a female. *Id.* It was her impression that Henry was not "interested in the entire situation." *Id.*

Henry suggested she talk to Ron Endicott, the Mountain Pine complex manager. *Id. at* 182. Ray testified she went to Endicott hoping to tell him her side of "what was written on . . . [the] probation papers." *Ray Deposition at* 183. Endicott told her it "sounded to him as if [she was] rationalizing [her] behavior instead of accepting responsibility for [her] behavior." *Ray Deposition at* 183.

He also told her there were three reasons a supervisor could be discharged:

> one was gross absenteeism, one was committing an offense that was so awful that that one offense could cause their discharge, the other was more difficult. It would involve building a case over recurring situations. It was more difficult to discharge someone on this, but it was also much more difficult to disprove it.

*Id. at* 184.

When she left Endicott's office, Ray felt that he had treated her "in a very uncaring, unconcerned" way. *Ray Deposition at* 188. She felt "frustrated and depressed." *Id.*

Once she received the notice of probation, Ray believed the company had made up its mind to terminate her and she felt betrayed by Welch. *Ray Deposition at* 187–92. However after a week or two, she became determined to "do so well and to have no problems, that they would not be able to do anything. That I would be as perfect as I could be." *Ray Deposition at* 188.

Welch had a follow-up meeting with Ray at the end of April or early May. *Welch Affidavit at* ¶ 11. He felt she was non-responsive and believed she had actually taken a step backward as a result of the April 13, 1995, memo. *Id.* He decided to "step back to see if she could get over whatever anger or upset she was experiencing and make an effort to show the desired improvement." *Id.* After this, Welch did not meet with her on a monthly basis and did not provide her with written feedback.

By late July 1995, Welch felt it necessary to address a number of additional performance issues with Ray. *Welch Affidavit at* ¶ 12. He prepared a draft memorandum which outlined her lack of progress since April and asked Endicott to review the draft. *Id.*

In the first part of August 1995, Welch met with Ray and discussed the items he outlined in the July 25, 1995, memorandum. *Welch Affidavit at* ¶ 13. He testified Ray had no input, no questions, and no comments. *Welch Deposition at* 377. *See also Welch Affidavit at* ¶ 13 (Her reaction was very non-responsive.) He "could see that her demeanor had got to the point where she wasn't interested in this information." *Welch Deposition at* 377. He had the "clear impression that she did not want to listen to what I had to say and that she was unable or unwilling to accept responsibility for change." *Welch Affidavit at* ¶ 13. Welch did not provide Ray with a copy of the memorandum. *Welch Deposition at* 377.

Among other things, Welch noted Ray had undermined her fellow supervisor, Elliott, by complaining to her crew that he had scheduled them to work an extra hour on July 15; had told members of her crew about her probation; had sought to have a union steward removed from her position; and had complained to her crew about the dry-end coordinator. Welch testified that various supervisors came to him about Ray's probation because they did not understand why it was made so public. *Welch Deposition at* 380–81. They also informed Welch that Ray was running the company in the ground and was saying she was going to get a lawyer and sue defendant. *Id.* at 381–82.

Welch recommended to Freeman that she be terminated because he believed "there were no other steps that I could take to bring about the improvement in her performance." *Welch Affidavit at* ¶ 14. The recommendation was reviewed and approved by Endicott, Freeman, and Henry. *Id.* Ray was terminated on September 18, 1995. After Ray's termination, she states that 56 hourly members and former members of her crews signed a petition disagreeing with her firing.

Ray remained on the payroll and group insurance plan until November 19, 1995. Ray was also given the opportunity to use the services of an out placement firm, Executive Recruiters, to assist her in finding new employment. Ray did not utilize these services.

Defendant contends Ray was terminated for marginal performance for which she had been counseled over a period of three years. Despite repeated coaching and counseling, defendant contends Ray did not show the improvement expected by the company.

During her deposition, Ray admitted Welch had talked with her about a variety of instances spanning a period of time from 1992 until 1995. However, she contends she was terminated because she was a female.

When asked why she believed this, she testified that while she was a supervisor she was "treated differently in a lot of areas than my co-workers." *Ray Deposition at* 217. When asked what areas, she replied: "In being singled out in meetings, having decisions made that affected me and not even being told about it. When I offer suggestions, they're ignored and other supervisors, male supervisors are asked. The general feeling that I was not important and I was not useful." *Id. at* 217–18. By way of example, Ray indicated that James Taylor would

always schedule a supervisors' meeting on her days off and that Taylor would ask for male supervisors' opinions during meetings and her opinion was not solicited. *Ray Deposition at* 218–19. When she complained about this to Welch, he talked to James Taylor who said he was unaware of the problem. *Welch Deposition at* 169. As some supervisor always had to attend on their day off, Welch asked James Taylor to attempt to rotate the meetings so that it was fair for everyone. *Id.*

On another occasion the procedure regarding when the core dryer should be shut down was changed at a meeting not attended by Ray and she was not informed of the change. *Ray Deposition at* 220. As a result, she had her crew shut down the dryer at an improper time and this was called to her attention by Taylor. *Id.*

On another occasion she tried to tell Lewis Ivey how she had solved a problem the night before to help him deal with the same problem and he just looked at her "laughed and walked away." *Ray Deposition at* 222–23. She also testified that Taylor would often take her "utility people and put them somewhere else and not inform me about it." *Id. at* 223–24.

From right before Welch got there until her termination, Ray perceived that nothing she did was right. She testified:

> When everything you do, no matter how hard you try, is not right, it's not good enough, you begin to feel—it affects the way you feel about yourself. And it also affects the way, when you're treated in that manner, as an unimportant person, those around you that you are responsible for also begin to look at you as if you're not an important person. And that was happening.

*Ray Deposition at* 224. She testified she was just not treated as if anything she did or said was very important. *Id. at* 226. There were also instances when she felt she didn't have the same amount of authority as other supervisors and that the same procedures did not apply to her. *Id.* As an example, she testified that when her employees had a problem "they were evidently encouraged to go over my head and to Jimmy or to Bobby and without my knowledge. This was discouraged with other supervisors." *Id.* She began to feel she had no authority because she was kept in the dark about so many things. *Id. at* 227.

Ray states that Brian McKenna is loud and abusive toward his crew and that many employee grievances have been filed against him. Despite this, Ray says he remains employed at defendant. Further, she points out that John Elliott has been harsh and cursed at his crew and a member of his crew was seriously injured in 1992 because of crew disruptiveness. Although he was counseled and placed on verbal probation, Ray points out he was not terminated, his performance evaluations say nothing of his relationship with his crew, and he was promoted to coordinator in March of 1995.

Defendant has now moved for summary judgment on two separate grounds. First, defendant contends Ray cannot prove a prima facie case of sex discrimination under Title VII because her repeated instances of marginal performance demonstrate she was not qualified to continue her employment. Second, assuming Ray is able to prove a prima facie case, defendant argues she cannot produce facts that establish its proffered reasons for terminating her were a pretext for discrimination.

### Summary Judgment Standard.

"Summary judgment is only appropriate when no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law." *Callanan v. Runyun,* 75 F.3d 1293, 1296 (8th Cir.1996) (citations omitted). All disputed facts are to be resolved and all inferences drawn in favor of the nonmoving party. *Id.*

The Eighth Circuit Court of Appeals has advised trial courts that summary judgments should be cautiously invoked so that no person will be improperly deprived of a trial of disputed factual issues. *Inland Oil & Transport Co. v. United States,* 600 F.2d 725 (8th Cir.1979). It has noted that this is especially true in discrimination cases because they often turn on inferences rather than direct evidence. Thus, the court has stated: "we are particularly deferential to the non-mov-

ing party alleging discrimination." *Webb v. Garelick Manufacturing Co.,* 94 F.3d 484, 486 (8th Cir.1996).

***Discussion.***

■ "Title VII prohibits an employer from discriminating 'against any individual with respect to [her] compensation, terms, conditions, or privileges of employment' on the basis of her gender." *Rorie v. United Parcel Service, Inc.,* 151 F.3d 757, 761 (8th Cir.1998).

■ There are three basic methods by which a plaintiff can attempt to demonstrate intentional employment discrimination: (1) the presentation of direct evidence; (2) the presentation of indirect evidence utilizing a three-step burden shifting framework by which an inference of intentional discrimination can be raised and (3) application of a mixed-motives analysis. *Hutson v. McDonnell Douglas Corp.,* 63 F.3d 771, 775–76 (8th Cir.1995).[7]

■ In this case, both sides utilize the indirect method. The indirect method of proof allows the plaintiff in a discrimination case to benefit from an inference of discrimination by establishing a so-called *prima facie case. Hutson,* 63 F.3d at 776.

> While its elements will vary depending on the circumstances of the case, the fundamental purpose of the *prima facie* case is to require the plaintiff to show (1) that an adverse employment action occurred, and (2) that the most common explanations for an adverse employment action, such as incompetence, are not applicable. Once established, the *prima facie* case entitles the plaintiff to a rebuttable presumption that intentional discrimination played a role in the adverse employment action.

*Hutson,* 63 F.3d at 776.

■ The standard elements of a prima facie case of sex discrimination in the termination context are: (1) that the plaintiff is a member of a protected class; (2) that she met applicable job qualifications; (3) that she was discharged; and (4) that her discharge occurred under circumstances that create an inference of unlawful discrimination. *Thomas v. First National Bank of Wynne,* 111 F.3d 64, 66 (8th Cir.1997).

■ If the plaintiff makes a prima facie showing, thus raising an inference of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for adverse employment action. If the defendant meets this burden, the plaintiff must prove that the defendant's reason is merely a pretext for discrimination. *Hutson,* 63 F.3d at 776–77; *Bashara v. Black Hills Corp.,* 26 F.3d 820, 823 (8th Cir.1994).

■ Defendant contends Ray cannot meet her burden of proving the second element of her prima facie case, *i.e.,* she cannot prove she was qualified to continue in her position of supervisor. It submits Ray cannot show she was meeting her employer's legitimate expectations for job performance. It points out Welch coached and counseled her regarding her performance problems over an extended period of time and took progressive steps in an effort to bring her performance up to an acceptable level. It contends that its records and Ray's own admissions plainly reveal that she was not meeting Weyerhaeuser's expectations as a supervisor.

Ray points out the threshold of proof necessary to make a prima facie case is minimal. Further, she argues this minimal burden is even lighter at the prima facie stage in a situation involving subjective criteria. Ray states she was terminated primarily because of the way she treated her crew. As she denies she mistreated her crew in any way, she contends there is clearly a question of fact.

Ray seems to believe her mere denial creates a genuine issue of material fact. Clearly it does not. If a mere conclusory statement was sufficient to create a genuine issue of material fact, the filing of summary judgment motions would be nothing more than an exercise in futility. Ray presents no affidavits or deposition testimony from crew mem-

---

7. The burden-shifting framework applies in pretext cases under either the Age Discrimination in Employment Act (ADEA) or Title VII and the prima facie case in the termination context is the same under either act. *See e.g., Hill v. St. Louis University,* 123 F.3d 1114, 1119 (8th Cir.1997).

bers or from any other supervisor or individual who observed her work performance.

Ray also argues the evidence will show that Welch assessed, recorded, and evaluated male supervisors in a much different way than he did Ray. For instance, she states that despite Elliott's behavior in being a "hollerer" and failing to control his shift, Welch did not make any negative comments on Elliott's evaluations indicating any performance problems.

However, Ray presents nothing which contradicts Welch's testimony that he had several counseling sessions with Elliott and even sent him to a training school in an effort to bring Elliott's behavior in line with Welch's expectations. Further, she has not disputed the testimony indicating Elliott left defendant's employ because his management style did not fit in with that expected by Welch.

While it is true that Welch seemed to document in written form more frequently his concerns regarding Ray's performance, the undisputed evidence is that Welch terminated four supervisors—three male, Lacaze, Ivey, and Baggett, and one female, Ray. All were terminated after they failed to conform their behavior with Welch's expectations.

In *Miller v. Citizens Sec. Group, Inc.*, 116 F.3d 343 (8th Cir.1997), the court made it clear that the second element of the prima facie case required plaintiff to establish she was performing her job at a level that met the employer's legitimate expectations. *Id.* at 346. It stated that no genuine issue of material fact is created by a conclusory statement that the plaintiff is meeting the employer's expectations, or by the presentation of evidence of prior job evaluations which are too far removed in time from the date of discharge, or by the fact that the employer only told the plaintiff once that his or her job performance was unsatisfactory. *Id.*

In *Miller*, the plaintiff presented evidence regarding satisfactory evaluations from April 18, 1990, July 26, 1990, and January 16, 1991. *Id.* The court held these evaluations were too far removed from the March 31, 1992, dis-

charge to create a genuine issue of fact with regard to whether plaintiff was meeting his employer's legitimate expectations at the time of the discharge or "at any time during the year before he was fired." *Id.*

Certainly, Ray's presentation of a complimentary letter written in April of 1987 does nothing to create an issue of fact regarding her satisfactory performance of her job in 1995. Likewise, her 1993 evaluation does not create a genuine issue of material fact. It is simply too far removed.

As Ray points out, her January 1995, performance evaluation was in the mid-range of the scale used and she received a pay increase in March of 1995 which was larger than she had received in other years.[8] These facts would suggest that at least in the first three months of 1995 she was performing at a satisfactory level. *But see Ziegler v. Beverly Enterprises–Minnesota, Inc.*, 133 F.3d 671, 675 (8th Cir.1998)(Overall favorable rating and high marks for financial management skills did not create genuine issue of material fact as to whether Ziegler was meeting her employer's legitimate expectations). Ray's termination, however, did not occur until September 18, 1995.

Additionally, while the overall rating of the January 1995 performance evaluation was satisfactory, the evaluation did identify a number of areas in which Welch felt Ray needed improvement. As evidenced by the April 1995 probation, Welch's dissatisfaction with Ray's overall performance continued to increase. Ray's continued problems conflicted with the goals set for her by Welch.

We conclude plaintiff has failed to create a genuine issue of fact as to whether she was meeting the legitimate expectations of defendant when it fired her. Despite this conclusion, we will for purposes of this motion assume plaintiff has established a prima facie case. We therefore turn to the question of whether defendant has offered a legitimate non-discriminatory reason for Ray's termination.

8. Unfortunately, neither party provides the court with information on the performance ratings of the other supervisors or on the pay increases given to other supervisors in 1995. The only pages of Welch's deposition submitted to the court which discuss the 1995 raises indicate all plant employees received at least a 2.5 percent increase in that year.

In this regard, defendant argues Ray cannot meet her burden of proving that the reason proffered by defendant for discharging her was pretextual. It points out that Ray was not the only supervisor who was counseled regarding performance problems. In fact, Welch terminated three male supervisors and two other male supervisors left Mountain Pine after Welch counseled them. It therefore argues Ray cannot prove she was treated differently than similarly situated male employees.

Clearly Weyerhaeuser has advanced a legitimate, nondiscriminatory reason for Ray's termination—it's dissatisfaction with her job performance and her failure to improve over a significant period of time. The burden therefore shifts to Ray to demonstrate the existence of a factual issue as to whether this explanation was a pretext for gender discrimination. *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1317 (8th Cir. 1996). In other words, she must show that the proffered reason is "unworthy of credence" to permit a trier of fact to find that a discriminatory reason motivated the discharge. *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 971 (8th Cir.1994).

> This is the critical inquiry because:
>
> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons, will *permit* the trier of fact to infer the ultimate fact of intentional discrimination . . . .

*Harvey*, 38 F.3d at 971, *quoting, St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993). "But there must be some additional evidence beyond the elements of the prima facie case

to support a finding of pretext." *Krenik v. County of Le Sueur*, 47 F.3d 953, 959 (8th Cir.1995). *See also Rose–Maston v. NME Hospitals, Inc.*, 133 F.3d 1104, 1108 (8th Cir.1998); *Ryther v. KARE 11*, 108 F.3d 832, 837 (8th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 2510, 138 L.Ed.2d 1013 (1997).

Ray argues there are a number of facts that show defendant's proffered reason was merely a pretext for discrimination. She asks us to consider the laundry list of ways in which she says she was subjected to sexist remarks, made to feel less important than her male counterparts, devalued, and written up with frequency.

While at first blush these incidents and comments appear to suggest the perpetuation of sexual stereotypes and perhaps a basis on which an inference of discrimination could be raised, when placed in proper context it is clear the incidents are not related in any way to the decision making process. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)("Remarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision."). It is important to remember what this case is about. This is not a hostile work environment case. Rather, Ray contends she was discharged because of her gender. Thus, we must differentiate between stray remarks and conduct engaged in which did not in any way affect the decisional process and conduct exhibiting a discriminatory animus in the decisional process. *See e.g., Bevan v. Honeywell, Inc.*, 118 F.3d 603 (8th Cir.1997).

Many of the most "sexist" incidents outlined by Ray occurred while Walsh was superintendent or while James Taylor was her coordinator. These incidents occurred two years or more prior to her termination.[9] Further, Ray has produced no evi-

---

9. In Title VII cases, the plaintiff may only recover for discriminatory acts which occurred within 180 days of the filing of the charge. *See e.g., Gipson v. KAS Snacktime Co.*, 83 F.3d 225, 229 (8th Cir.1996) (If an act of discrimination is not timely challenged, the right to relief expires.). *See also Rorie v. United Parcel Service, Inc.*, 151 F.3d 757 (8th Cir.1998) (actionable incidents of discrimination are those that occur within 180

days of filing a complaint with the EEOC). The limitation period reaches back 180 days from the charge filing date. In other words, a Title VII claimant may recover for any discriminatory acts for which the statute of limitations has not expired. *Kimzey v. Wal–Mart Stores, Inc.*, 107 F.3d 568, 572–73 (8th Cir.1997).

However, "[e]vidence of incidents occurring outside the limitations period may still be admis-

dence to indicate that either Walsh or James Taylor had any input into the decision to terminate her. In fact, Walsh had left before Welch was hired as superintendent. She further testified that when she complained of James Taylor's actions Welch took steps to ensure the behavior did not reoccur and she concedes it did not.

Ray also asks us to consider the subjective nature of the criteria which was applied by Welch. She points out that when subjective criteria are utilized the employer may easily sabotage a plaintiff's case and mask the underlying discrimination. Ray cites the court to the case of *Lyoch v. Anheuser–Busch Companies*, 139 F.3d 612 (8th Cir.1998).

The *Lyoch* case involved a subjective promotions process. The Eighth Circuit, relying on *Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1510 (10th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 626, 139 L.Ed.2d 607 (1997), held that the plaintiff faced with a subjective promotions process had a lighter burden when attempting to make a prima facie case than a plaintiff in a case involving objective promotions or hiring criteria applied to all applicants. *Lyoch*, 139 F.3d at 615. *See also McCullough v. Real Foods, Inc.*, 140 F.3d 1123 (8th Cir.1998).

It noted this "lighter burden at the prima facie case was justified by the fact that subjective criteria for promotions 'are particularly easy for an employer to invent in an effort to sabotage a plaintiff's prima facie case and mask discrimination.'" *Lyoch*, 139 F.3d at 615 (citation omitted). In *Thomas* the court had held that:

> a prima facie ·showing can be made through credible evidence that a plaintiff was qualified even if that evidence was disputed by the employer, and ... this burden may be met through the plaintiff's own testimony and that of co-workers who were in a position to know the plaintiff's qualifications.

*Thomas*, 111 F.3d at 1510.

■ Title VII, however, does not prohibit an employer's use of subjective employment criteria and does not "alone shift[ ] to the defendant the burden of proving absence of intentional bias." *Casillas v. United States Navy*, 735 F.2d 338, 345 (9th Cir.1984). Use of the subjective criteria is considered along with the other facts and circumstances including the nature of the job. *Id.*

■ Ray must do more than disagree with the employer's subjective assessment. *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1124, 1125 (7th Cir.1994)(where reason given for discharge was poor performance, employee must do more than simply disagree; affidavits from co-workers attesting to plaintiff's satisfactory performance will not create a genuine issue of fact); *Perfetti v. First Nat'l Bank*, 950 F.2d 449, 457 (7th Cir.1991)(employer may rely on subjective judgment of plaintiff's capabilities even where plaintiff was objectively superior to an employee who was not fired). In the termination context where the basis of the employer's decision is poor or unsatisfactory job performance, the plaintiff must at the summary judgment stage present some evidence rendering the employer's belief unworthy of credence.

The relevant inquiry is whether plaintiff has created a genuine issue of material fact as to whether the proffered reason for her discharge was pretextual. The issue before the court is not whether Ray should have been terminated. The issue, instead, is whether the record reflects that plaintiff has created a legitimate issue as to whether she was terminated because of her gender.

As we noted above, Ray has failed to present any evidence that the remarks she relies on were either made by a decision maker, or made in connection with the decisional process, or were linked in any way with her termination. *Aucutt*, 85 F.3d at 1315–16. When all the evidence is carefully considered, there is simply no evidence suggesting the existence of bias. Ray was simply one of four supervisors terminated because they did not conform with Welch's "management

sible." *Kimzey*, 107 F.3d at 572. "One instance is when the incidents are part of a continuing violation." *Kimzey*, 107 F.3d at 572–73. "Incidents which occurred outside the filing period

also may be admissible as relevant background to later discriminatory acts." *Kimzey*, 107 F.3d at 573. *See also Rorie v. United Parcel Service, Inc.*, 151 F.3d 757 (8th Cir.1998).

style." Two other supervisors, both male, left because they saw the "writing on the wall." Whether good or bad, Welch's management style apparently differed significantly from that of previous superintendents and resulted in six supervisors leaving, either voluntarily or involuntarily, defendant's employ. We conclude the plaintiff has failed to present sufficient evidence that the decisionmaker, Welch, harbored gender based discriminatory animus to create a genuine issue of material fact. *Aucutt,* 85 F.3d at 1317.

### Conclusion.

For the reasons stated, defendant's motion for summary judgment will be granted by a separate order entered concurrently herewith. Since we are granting the motion on the Title VII claim, we decline to retain supplemental jurisdiction over the state law claim. 28 U.S .C. § 1367(c)(3).